UNITED STATES of America,
Plaintiff-Appellee,

v.

Lawrence Richard PETERSON,
Defendant-Appellant.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Donald Wayne PAYNE,
Defendant-Appellant.

Nos. 76–1438 and 76–1449.

United States Court of Appeals,
Ninth Circuit.

March 3, 1977.

Before BROWNING, WRIGHT and CHOY, Circuit Judges.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

Peterson and Payne appeal from convictions of conspiracy to import and distribute marijuana. The indictment charged that they and three others were involved in a criminal conspiracy between February 1975 and the time of their arrests in September 1975. A subsequent information in October 1975 alleged that Peterson previously was convicted of a felony relating to marijuana.

Five issues are raised:

1. Was there sufficient evidence to sustain the verdict?

2. Did the trial court err in admitting hearsay declarations of a co-conspirator and evidence of prior acts before Payne's involvement in the conspiracy was established?

3. Did the government cause reversible error in calling a witness who sought a grant of immunity after claiming his Fifth Amendment privilege before the jury, where that witness was thereafter granted immunity and testified for the government?

4. Did the trial judge err in giving an *Allen*-type jury instruction under the circumstances of this case?

5. Were the detentions, arrests and searches at the Calhoun Ranch on September 4, 1975, supported by probable cause?

## FACTS

Our review of the evidence in the light most favorable to the government reveals that in February 1975 a post office box was rented in Payne's name at the Incline Village, Nevada post office. There was no evidence to show that Payne personally ordered it, although his driver's license used for identification at that time was introduced in evidence. Also admitted was a letter of February 1975, purportedly from Payne to the Incline Village Post Office, directing it to forward mail to a California address.

Victor Sherman, Beverly Hills, Cal., argued, for defendant-appellant in 76–1438.

Raymond D. Pike, Asst. U.S. Atty., Reno, Nev., argued, for plaintiff-appellee.

Penelope M. Cooper, Berkeley, Cal., argued, for defendant-appellant, in 76–1449.

In May 1975, Peterson offered Charles Hudson an opportunity to make "a quick $10,000." Hudson agreed and they flew from Nevada to Mexico on what proved to be an aborted marijuana smuggling run. Once in Mexico they were met by a person called "the Indian" (co-conspirator Leland Quinn), loaded the plane with marijuana, then crashed on take-off. After retrieving the contraband, the trio burned the plane.

One month later, John Evans and Hudson purchased a new aircraft, N6676. It was flown to Nevada and equipped with a long-range gas tank supplied by Peterson. With the tank installed, Evans, and possibly others, flew N6676 to Mexico for marijuana hauls.

This pattern of activity continued into August 1975 when Hudson and Peterson flew at least two illicit flights from Mexico to the isolated Calhoun Ranch in San Luis Obispo County, California. On at least one occasion Peterson gave Hudson $20,000 after their return with the marijuana. After each of these August sojourns Hudson and Peterson flew to the San Francisco Bay Area and visited Payne's residence.

In late August 1975, Evans began to co-operate with federal agents and, on August 29, placed a monitored telephone call to Hudson. In that conversation Hudson indicated that George Camara was in Mexico and that a marijuana shuttle to be flown by Evans was scheduled for Tuesday, September 2. Hudson said also that another plane to be used for Mexican flights was almost ready at the Van Nuys, California Airport.

The evidence also indicated that during the summer Hudson had purchased in Payne's name a D–18 aircraft, N90513, from Fred Hollister. Hudson told Hollister that he was Payne's partner and he registered the aircraft in Payne's name using the Incline Village address. The post office box contract had expired by its own terms on June 30, 1975.

All dealings in connection with N90513 were through Hudson. Hudson and Evans discussed registering the plane in Payne's name, Hudson registered it, and Hudson sought to recover the plane as his property after the instant charges were filed. Despite the use of his name, there is no showing that Payne was connected with the purchase, operation or registration of N90513.

Aircraft N90513 was moved to the Oxnard-Ventura, California airport on September 3. That evening, Peterson, Hudson and Camara were at the Calhoun Ranch in an orange and white Cessna 310. Camara left for Mexico in the N90513, Peterson flew out to Las Vegas in the Cessna, and Hudson left the ranch the next morning.

Upon his return from Mexico on September 4 in N90513, DEA agents arrested Camara and others at the Calhoun Ranch. They also seized a large quantity of marijuana found in a blue camper van used at the ranch by the smugglers.

Realizing that N90513 was overdue, Hudson telephoned Peterson to intercept the aircraft. Peterson agreed and later that day DEA agents observed an orange and white Cessna 310 circling the Calhoun Ranch. The agents heard a voice on radio frequency 120.0 (that used by the smugglers at the ranch) from "Pete" asking if everything was all right. Defendants were arrested shortly thereafter.

Evidence was introduced which demonstrated a conspiracy late in 1974 among Peterson, Payne, Tim Melancon and Donald Johnson to smuggle marijuana from Mexico by air. Payne was the source of funds in this scheme and the others were pilots who made regular flights across the border with loads of marijuana.

■ Our careful examination of the record reveals that, contrary to the government's assumption, at least two conspiracies existed. The first involved Peterson, Payne, Melancon and Johnson late in 1974 (the 1974 conspiracy). A critical litmus test in determining where one conspiracy ends and another begins is to inquire whether any of the major participants in the conspiracy considered his or their mutual dealings to have terminated, *United States v. Panebianco,* 543 F.2d 447, 453 (2d Cir. 1976). Testimony demonstrated that two central

figures in the 1974 conspiracy, Melancon and Johnson, believed that the common scheme had terminated in December of that year. There was no further relationship among the co-conspirators and nothing to indicate a continuing conspiracy. As a result, the conspiracy charged (the 1975 conspiracy) was distinct and not merely a continuation of the illegal activities of 1974.

Shortly before trial, co-defendant Hudson pleaded guilty and became the government's principal witness.

## ISSUES

1. *Sufficiency of the Evidence and Evidence of Prior Acts.*

It is axiomatic that the government must prove beyond a reasonable doubt that the conspiracy charged did in fact exist, and that each defendant was a member of it.

■ Once the government establishes the existence of a conspiracy through independent evidence, only slight evidence is required to connect a defendant with it. *United States v. Carpio,* 547 F.2d 490 (9th Cir. 1976); *United States v. Turner,* 528 F.2d 143, 162 (9th Cir. 1975). The requirement of only slight evidence does not eliminate the government's need to introduce that minimal quantum of proof independently establishing that each defendant "entered, participated in, or furthered the conspiracy." *United States v. Spanos,* 462 F.2d 1012, 1016 (9th Cir. 1972); *citing United States v. Cianchetti,* 315 F.2d 584, 587 (2d Cir. 1963).

■ To establish the existence of a criminal conspiracy the underlying common scheme or plan may be inferred from circumstantial evidence, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680 (1942), which we have held to be no less probative than direct evidence. *United States v. Nelson,* 419 F.2d 1237, 1239 (9th Cir. 1969).

Appellants do not deny there was proof of a marijuana smuggling conspiracy. They do argue that they were not shown to be part of it.

■ The evidence against Peterson reveals that he was a central figure in the 1975 conspiracy. Additionally, he argues that the evidence proves three separate conspiracies when only one was charged. Our review reveals no fatal variance between the indictment and the proof against Peterson. *See, e. g., United States v. Moore,* 522 F.2d 1068, 1074 (9th Cir. 1975), *cert. denied,* 423 U.S. 1049, 96 S.Ct. 775, 46 L.Ed.2d 637 (1976).

The evidence against Payne requires closer scrutiny. The independent evidence against him on the conspiracy charge consisted of:

(1) the evidence of a post office box rented in Payne's name at Incline Village and the subsequent letter;

(2) the testimony of Payne's acquaintance in the Bay Area, Sharon Leonard, that Payne had told her that two of his airplanes had been lost;

(3) the testimony of Hudson that Payne met Peterson and Hudson at the airport following two of their hauls, but to discuss legitimate business ventures;

(4) the evidence and testimony of Hudson surrounding the purchase and registration of aircraft N90513; and

(5) the testimony of a DEA agent who, while keeping Peterson under surveillance, observed Payne's red automobile outside Peterson's home.

■ Much of the difficulty with the sufficiency of the evidence against Payne stems from the order of proof at trial. Evidence often is so intertwined in conspiracy cases that it is impractical to separate independent evidence, evidence of prior or unrelated acts and hearsay declarations by co-conspirators. Indeed, we have long recognized that *the order of proof is a matter within the sound discretion of the trial court. United States v. Smith,* 445 F.2d 861, 862 (9th Cir.), *cert. denied,* 404 U.S. 883, 92 S.Ct. 212, 30 L.Ed.2d 165 (1971).

■■ This inability to separate various types of evidence according to the logical point of introduction does not, however, ex-

cuse the government from establishing by independent evidence the involvement of each defendant in the conspiracy charged. To demonstrate a meeting of minds, one of them must be shown to be Payne's. In our judgment the government failed to link Payne to the 1975 conspiracy through independent evidence. Neither mere association and activity with a co-conspirator nor even knowledge of the conspiracy's existence—not proven here—meets the standards we require to link a defendant to the conspiracy charged. *United States v. Basurto,* 497 F.2d 781, 793 (9th Cir. 1974).

■ Hearsay declarations of a co-conspirator are inadmissible if no "substantial, independent evidence" links the defendant to the conspiracy. *United States v. Nixon,* 418 U.S. 683, 701 n. 14, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Glasser, supra,* 315 U.S. at 74, 62 S.Ct. at 457. Moreover, hearsay declarations cannot serve as the requisite independent evidence of participation in the conspiracy. *See, e. g., United States v. Hopkins,* 518 F.2d 152, 156 (3rd Cir. 1975).

■ We have previously permitted otherwise inadmissible declarations of co-conspirators to be introduced when:

(a) the declaration was in furtherance of the conspiracy;

(b) it was made during the pendency of the conspiracy; and

(c) there is independent proof of the existence of the conspiracy and of the connection of the declarant and the defendant with it. *United States v. Pheaster,* 544 F.2d 353, 381 (9th Cir. 1976), *quoting Carbo v. United States,* 314 F.2d 718, 735 n. 21 (9th Cir. 1963), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1625, 12 L.Ed.2d 498 (1964). The last element of the test is absent here. As a result, Hollister's testimony that Hudson told him, at the time Hudson purchased N90513, that Payne was his partner was inadmissible.

The record, once purged of the admissions by a party-opponent [Rule 801(d)(2)(E), F.R. Ev.], and the evidence of prior and unrelated acts, fails to provide evidence sufficient to meet the minimal burden placed on the government. Payne's conviction must be reversed.

### 2. *Prosecutorial Misconduct.*

■ At trial, Hudson was called to testify by the government but, upon advice of counsel and before the jury, exercised his Fifth Amendment privilege against self-incrimination. The government then obtained a grant of immunity for Hudson, and he testified at length thereafter.

Once the government sought the grant of immunity, Payne and Peterson moved for a mistrial on the ground that the United States Attorney knew that Hudson was to exercise his Fifth Amendment privilege but failed to apprise the court of it outside the presence of the jury. The motion for a mistrial was denied as was a subsequent motion for a mistrial based on prosecutorial misconduct.

Appellants contend this maneuver made Hudson appear to be an unwilling witness who was compelled to testify against former associates only because of the terms of the grant of immunity. The argument is that this enhanced his credibility in the eyes of the jury to the substantial prejudice of appellants.

The government denies any impropriety and insists that no prejudice to appellants has been demonstrated. On receiving authority to apply for a court order to grant Hudson immunity, government counsel spoke with Hudson and determined that he would not persist in refusing to testify if granted immunity.

In *Namet v. United States,* 373 U.S. 179, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), the Court suggested two factors to be considered in determining error. First, did the government make "a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege[?]" *Id.* at 186, 83 S.Ct. at 1154. Our review of the record fails to reveal evidence that the government attempted to do so.

Second, did the inferences from Hudson's refusal to answer add "critical weight to the prosecution's case in a form not subject

to cross-examination . . . [?] " *Id.* at 187, 83 S.Ct. at 1155. Here, Hudson took the stand, testified after being given a grant of immunity, and was cross-examined extensively. Peterson's counsel made full use of that opportunity, including a probe of any agreements Hudson may have had with the government.

The Seventh Circuit recently confronted a similar situation, *United States v. Crouch,* 528 F.2d 625, 632–33 (7th Cir. 1976). There the prosecution called a witness knowing that he would invoke his Fifth Amendment privilege. After doing so before the jury, the witness was given a grant of immunity and testified freely. The court held that there was no prosecutorial misconduct when there was no evidence of an impermissible attempt to bolster the prosecution's case and when the witness was subject to cross-examination. *Id.*

Similarly, neither *Namet* consideration is present here. Although it would have been better for the government to have informed the trial judge outside the presence of the jury that Hudson would invoke the privilege, we find no reversible error in the circumstances of this case.

### 3. *Allen Charge.*

Appellants argue that under the facts of this case, it was reversible error for the trial judge to give the Allen-type charge. *See, e. g., Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896); *Marsh v. Cupp,* 536 F.2d 1287 (9th Cir. 1976).

The jury was instructed and began its deliberations on Friday morning. Late that afternoon the jury reported: "We are deadlocked. What are your instructions?"

The court excused the jurors at 5:00 P.M. on Friday and told them to return Monday morning to resume deliberations. On Monday, the jury requested the rereading of some testimony and asked for a clarification of one instruction. The jury again was excused at 5:00 P.M.

That evening, the judge informed counsel that he intended to give the *Allen*-type

charge on Tuesday if it appeared necessary. On Tuesday morning the jury reported: "We are hopelessly deadlocked." The court then gave the *Allen*-type charge over objection by appellants' counsel.

Soon thereafter, the jury requested that other testimony be reread. At 2:45 P.M. on Tuesday it returned guilty verdicts.

■ Although a single *Allen*-type charge has been considered by some to be coercive, the general standard in determining whether such an instruction is error is to consider all circumstances of the case to determine if it was coercive. *Jenkins v. United States,* 380 U.S. 445, 446, 85 S.Ct. 1059, 13 L.Ed.2d 957 (1965).

Appellants' trial lasted three days and the jury was confronted with the testimony of 24 witnesses. Like many conspiracy cases, the unraveling of events and personalities here was not an easy task for a fact finder.

■ Although the jury's expression that it is "hopelessly deadlocked" may be significant, it is not determinative. The time necessary to reach a verdict is "best left to a trial judge", *United States v. Goldstein,* 479 F.2d 1061, 1069 (2d Cir.), *cert. denied,* 414 U.S. 873, 94 S.Ct. 151, 38 L.Ed.2d 113 (1973), who can weigh the various factors involved in any given case. In the face of the circumstances in the instant case the trial judge soundly exercised his judicial responsibility to guide and direct the jury when he gave the additional instruction.

### 4. *Probable Cause.*

■ Peterson argues that the law enforcement officers had no probable cause to conduct the search and seizure at the Calhoun Ranch on September 4, 1975, nor did the search come within an exception to the warrant requirement.

More specifically, appellant contends that the agents' surveillance led only to observations of activities that were consistent with innocent ones. Additionally, he attacks the information from the government informer as unreliable and uncorroborated.

We agree with the trial judge that the facts and inferences necessary to support probable cause were abundant. The record reveals that the informant's information was independently corroborated, that the agents were independently aware of Peterson and the nature of the illegal smuggling operation, and that Evans previously had given the agents a detailed admission of his involvement and the conduct of the smuggling operation.

The existence of probable cause fit the "automobile exception" to the requirement of a search warrant, *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). Moreover, there was abundant reason to believe the camper contained contraband and there existed exigent circumstances because it was "threatened with imminent removal or destruction." *United States v. Canada*, 527 F.2d 1374, 1379 (9th Cir. 1975), *quoting Hernandez v. United States*, 353 F.2d 624, 627 (9th Cir. 1965), *cert. denied*, 384 U.S. 1008, 86 S.Ct. 1972, 16 L.Ed.2d 1021 (1966).

> The succession of superficially innocent events had proceeded to the point where a prudent man could say to himself that an innocent course of conduct was substantially less likely than a criminal one.

*United States v. Patterson*, 492 F.2d 995, 997 (9th Cir. 1974).

On the basis of all the facts known to the agents and the reasonable inferences that could be drawn from them, there was probable cause.

Payne's conviction is reversed and remanded. The conviction of Peterson is affirmed.