UNITED STATES of America, Plaintiff-Appellee,

v.

Raymond A. HUBERTS, Defendant-Appellant.

UNITED STATES of America, Plaintiff-Appellee,

v.

Shirley L. SHELLEY, Defendant-Appellant.

Nos. 79–1828, 79–1829.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 3, 1980.

Decided Sept. 12, 1980.

Revised Opinion Dec. 4, 1980.

Mark W. Perrin, Eugene, Or., for defendants-appellants.

Sidney I. Lezak, U. S. Atty., Portland, Or., Lauren Holland, Eugene, Or., argued for plaintiff-appellee; Larid C. Kirkpatrick, Asst. U. S. Atty., Eugene, Or., on brief.

Before SNEED and NELSON, Circuit Judges, and GRAY,* District Judge.

WILLIAM P. GRAY, District Judge:

Appellants Raymond A. Huberts and Shirley L. Shelley were convicted in a stipulated facts trial of violating 18 U.S.C. §§ 371[1] and 472[2] by conspiring to possess and, with intent to defraud, pass counterfeit United States currency. We affirm.

---

* Honorable William P. Gray, United States District Judge, Central District of California, sitting by designation.

1. 18 U.S.C. § 371 provides in pertinent part:
   "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

2. 18 U.S.C. § 472 provides:
   "Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both."

## I. *FACTS*

During the afternoon of August 22, 1978, Mr. and Mrs. Ralph Carter, Shelley's mother and stepfather, took Mrs. Carter's twelve-year-old daughter, Janine Doege, to the Douglas County Sheriff's Office and lodged a complaint against Huberts, alleging that he had sexually abused Janine. In response to the complaint, Detective Chirrick stopped Shelley's 1973 Volkswagen van in which both appellants were riding. When informed of the complaint, Huberts voluntarily accompanied Detective Chirrick to the sheriff's office for questioning. In the course of the stop, sheriff's deputies saw, in plain view inside the van, a wallet, a brown leather briefcase, and a paper cutter.

Huberts was questioned by Sergeant Willis at the sheriff's office for half an hour and released. Upset at Huberts' release, the Carters advised Sergeant Willis that the briefcase remaining with Shelley might contain counterfeit currency. Mrs. Carter then told the officer that while the appellant stayed with the Carters for approximately one month, several weeks before August 22, 1978, the following occurred:

1. Mrs. Carter saw a twenty-dollar bill that she thought was counterfeit lying in an open suitcase belonging to Huberts or Shelley.

2. Shelley acknowledged to Mrs. Carter that she and Huberts were involved in the manufacture and distribution of counterfeit currency and that Huberts had made $250,000 in counterfeit twenty-dollar bills in Denver, Colorado.

3. Shelley removed a counterfeit bill from a brown leather briefcase with latches and a combination lock and showed it to Mrs. Carter.

4. Mrs. Carter saw what appeared to be counterfeit currency in a wallet owned by Huberts. The wallet had numerous card slots and the slots contained new twenty-dollar bills folded in 1½–2 inch squares.

5. Mrs. Carter observed a paper cutter in the possession of Huberts and Shelley. Additionally, Detective Vest had reported previously to Sergeant Willis that Janine had told him that the appellants had been passing counterfeit money during the previous year on the East Coast.

As a result of these allegations and Detective Chirrick's previous observations, the officers again stopped the van when it was occupied only by Shelley. The officers confronted her with the counterfeiting allegations and, over her objection, the officers seized a paper cutter, two wallets, a ladies' blue cloth handbag, a .380 automatic pistol, and a brown leather briefcase. The officers opened the wallets and found what appeared to be a counterfeit twenty-dollar bill.

The brown leather briefcase had a locking mechanism similar to that described by Mrs. Carter. The briefcase was partly open and the officers saw currency through the gap. With the aid of a plastic pen, they "fished out" over $1,300 in genuine currency. Shelley denied ownership or knowledge of the briefcase.

Before arresting Shelley, Detective Vest removed a twenty-dollar bill from the just seized wallet and had it confirmed as counterfeit at a nearby bank. Huberts was located later that afternoon and was returned to the sheriff's office where he was arrested.

That evening, United States Secret Service Agent Huebner arrived at the sheriff's office to conduct the counterfeiting investigation. He and Detective Chirrick opened the leather briefcase by breaking the center latch. They found approximately 200 counterfeit twenty-dollar bills, numerous pieces of identification of both appellants, and the business card of Lawrence Gustafson, a Denver, Colorado attorney.

Ten days later Agents Blecha and Huebner interviewed Mrs. Carter. She told them that Shelley had indicated that the appellants had purchased an expensive camera and printing press. The press, she added, was purchased on consignment by an attorney in the Denver area. She informed Agent Blecha orally of the attorney's name. He wrote it down, spelling it phonetically as G-e-s-t-o-f-f-e-r-s-o-n.

Agent Huebner, who had received the information concerning the Denver attorney from Blecha, relayed the attorney's name to an agent in Denver. However, since Heubner knew the correct spelling from the attorney's business card found in the briefcase, he spelled the name correctly as Gustafson.

The agent in Denver received only the name. He looked up Gustafson's address and telephone number in the Denver telephone directory. From his subsequent conversation with Gustafson, the agent learned that Huberts, using the alias Leslie Farmer, had requested the attorney to purchase some photographic equipment on consignment. Gustafson believed that the firm's name was something like "Rocky Mountain."

The agent, by looking through the telephone directory, located the firm—Rocky Mountain Offset Repair and Sales. The agent later showed photographs of the appellants to employees of the firm and they identified Huberts as the purchaser of the press and Shelley as being present during the sale.

The trial court first upheld all the searches, tried Huberts and Shelley on stipulated facts, and found them guilty. However, before sentencing, this court issued its opinion in *United States v. Stewart*, 591 F.2d 63 (9th Cir. 1979), *withdrawn by court order*. On the basis of Stewart's application of *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977) to automobiles, the district court reversed itself, finding probable cause for the stop and arrest of Shelley (and the later arrest of Huberts) and the search of the van, but held that the police had no right to make a warrantless search of the contents of the briefcase. The court therefore ordered the contents of the briefcase suppressed. The Government appealed this order, but subsequently withdrew its appeal when the Supreme Court issued its opinion in *Arkansas v. Sanders*, 443 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). The Government reindicted Huberts and Shelley. They again were tried on stipulated facts and found guilty.

The appellants now bring this appeal, raising Fourth Amendment search and seizure issues. They contend that (1) the initial stop of the Volkswagen van and a subsequent interview of Huberts at the sheriff's office constituted a detention and arrest made without probable cause; (2) the second stop of the van and subsequent arrest of Shelley was made without probable cause; (3) the "Denver evidence" was "fruit of the poisonous tree"; (4) the Grand Jury considered previously suppressed evidence; (5) the subpoena issued against attorney Gustafson should have been suppressed; and (6) the identification of the appellants by Denver witnesses should have been suppressed. We reject each of these contentions.

## II. THE INITIAL STOP AND SUBSEQUENT STATIONHOUSE INTERVIEW

The appellants argue that the stop and interview each constituted a detention, which must be justified by a showing of probable cause. They argue further that the trial record contained no facts from which a reasonable person could conclude that Huberts sexually abused Janine, and therefore, since no probable cause existed, all evidence seized as a result of the illegal detention must be suppressed.

The appellants are correct that specific facts are not revealed in the trial transcript. However, a determination of probable cause is not necessary here, because this case is governed by the principles set forth by the Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

In *Terry*, the Court recognized the conflict between effective law enforcement and the Fourth Amendment's proscription against unreasonable searches and seizures. The Court struck a balance, permitting a "police officer . . . in appropriate circumstances and in an appropriate manner [to] approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to make an arrest." *Adams v. Williams*, 407 U.S.

143, 145, 92 S.Ct. 1921, 1922, 32 L.Ed.2d 612, *quoting Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. at 1880. The appropriate circumstances have been interpreted to permit a brief detention of a suspect for investiga-- tive purposes where the officer forms, on the basis of his experience and from particular objective criteria, the reasonable suspicion that the person may have committed or is about to commit a crime. *United States v. Brignoni-Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975); *United States v. Collom*, 614 F.2d 624, 628 (9th Cir. 1979); *United States v. Post*, 607 F.2d 847, 850 (9th Cir. 1979); *United States v. Holland*, 510 F.2d 453, 455 (9th Cir. 1975), *cert. denied*, 422 U.S. 1010, 95 S.Ct. 2634, 45 L.Ed.2d 674 (1975). Therefore, we must determine only whether Detective Vest formed a reasonable suspicion from his interviews with the Carters and Janine to justify a brief field detention of Huberts to investigate their charges.

█ Since the trial judge found that the officer had a reasonable suspicion justifying the stop, we must view the evidence in the light most favorable to the Government, *United States v. Vital-Padilla*, 500 F.2d 641, 642–43 (9th Cir. 1974); *United States v. Walling*, 486 F.2d 229, 236 (9th Cir. 1973), *cert. denied*, 415 U.S. 923, 94 S.Ct. 1427, 39 L.Ed.2d 479 (1974), and we will not reverse unless those findings are clearly erroneous. *United States v. Cortez*, 595 F.2d 505, 507 (9th Cir. 1979); *United States v. Wysong*, 528 F.2d 345, 348 (9th Cir. 1976).

Employing this standard of review, we conclude that the trial judge correctly determined that Detective Vest formed a reasonable suspicion that Huberts sexually molested the little girl. When the complaint was filed, Detective Vest interviewed Mr. and Mrs. Carter with Janine, then Janine separately. At trial, Vest was asked to specify the subject matters of these interviews. He testified to their being the "rape-sodomy-type offense" against Janine and counterfeiting activities of the appellants the previous year. Moreover, on direct examination by the Government, and without objection, he was expressly re-

quested not to discuss the contents of the interviews. Thus, we affirm the trial judge's findings.

█ Likewise, we accept the trial court's determination that the information was trustworthy. The standard for reliability of both the informant and the information was set forth in *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and later explained in *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). It requires (1) facts which show the informer is credible or the information is reliable, and (2) underlying circumstances which verify the validity of the informer's conclusions. *United States v. Perez-Esparza*, 609 F.2d 1284, 1287 (9th Cir. 1980); *United States v. Larkin*, 510 F.2d 13, 14 (9th Cir. 1974).

█ Here, the information justifying the stop came from, among others, the victim of the alleged sexual molestation. In cases where the informant has been the victim, courts have eased the showing necessary for the informant to be deemed credible and his information reliable because of the "built-in credibility . . . to the informant's reliability." *United States v. Swihart*, 554 F.2d 264, 269 (6th Cir. 1977) *quoting McCreary v. Sigler*, 406 F.2d 1264, 1268 (8th Cir. 1969), *cert. denied*, 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). Accordingly, we conclude that the brief detention of Huberts and the request that he answer some questions about the incident were grounded on a reasonable suspicion. *See United States v. Banks*, 539 F.2d 14, 17 (9th Cir. 1976), *cert. denied*, 429 U.S. 1024, 97 S.Ct. 644, 50 L.Ed.2d 626 (1976); *United States v. Mahler*, 442 F.2d 1172, 1174 (9th Cir. 1971), *cert. denied*, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545 (1971).

Next, we turn to the stationhouse interview of Huberts. The appellants argue that Sergeant Willis' interview with Huberts was, because of its duration, equivalent to an arrest under the rule of *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) and, therefore, must be supported by probable cause. The appellants further contend it is irrelevant that Huberts voluntarily accompanied the offi-

cers to the stationhouse, because *Dunaway* clearly held that it is a question of duration, rather than the nature of the detention, that is determinative of a permissible stop under *Terry*. We find the appellants' reliance meritless for reasons provided by the following analysis of *Dunaway*.

■ In *Dunaway*, Rochester, New York police had information, but less than probable cause, connecting the defendant with a robbery-murder of the owner of a pizza parlor. Police officers picked up Dunaway at a neighbor's house and transported him to police headquarters where he was placed in an interrogation room. The defendant was not told he was under arrest but would have been restrained had he attempted to leave.[3] After giving Dunaway his *Miranda* warnings, police questioned him. He waived counsel and eventually made statements and drew sketches which were used to convict him.

The issue before the Supreme Court was whether the stationhouse detention on less than probable cause for the purpose of interrogation violated the defendant's Fourth Amendment right to be free from unreasonable seizure.

In determining that the defendant's seizure had constituted an unlawful detention, the Court analyzed the limited duration of the *Terry* "stop and frisk" exception. *Terry* involved a minimal intrusion, a brief stop for investigative purposes. A full-scale detention or arrest constituted a longer, more "serious intrusion upon the sanctity of the person and therefore must be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." *Dunaway v. New York*, 442 U.S. at 209, 99 S.Ct. at 2254, *quoting Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879.

The Court also recognized that the nature of the defendant's detention was critical in determining whether a seizure had occurred. The Court emphasized both the length and the involuntariness of Dunaway's seizure:

"[T]he detention of petitioner was in important respects indistinguisable from a traditional arrest. Petitioner was not questioned briefly where he was found. Instead, he was taken from a neighbor's home to a police car, transported to a police station, and placed in an interrogation room. He was never informed that he was 'free to go'; indeed, he would have been physically restrained if he had refused to accompany the officers or had tried to escape." *Dunaway v. New York*, 442 U.S. at 212, 99 S.Ct. at 2256.

Such a procedure, the Court reasoned, was outside the limited intrusions permitted by *Terry* and its progeny and therefore required probable cause. *Id.* at 213, 99 S.Ct. at 2257.

■ Thus, as appellants contend, where there is less than probable cause to justify a stop, duration is an essential element in determining whether the initially lawful intrusion takes on the characteristics of an unlawful detention. However, *Dunaway* stressed a second element, an involuntary detention. In the instant case that second element is lacking. Here, Huberts consented to accompany Detective Chirrick to the sheriff's office for questioning. Nowhere is there any assertion that Huberts' consent was anything but voluntary. Moreover, this court has held that when an officer is justified in stopping a suspect for questioning, the stop does not become an arrest if, in the absence of protest or coercion, the officer directs the person to an interview room for questioning. *United States v. Post*, 607 F.2d 847, 851 (9th Cir. 1979); *United States v. Chatman*, 573 F.2d 565, 567 (9th Cir. 1977); *Cf. United States v. Brignoni-Ponce*, 442 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975) ("officer may question driver and passengers about their immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause"); *Schneckloth v. Bustamonte*, 412

---

**3.** Restraint of freedom constitutes a seizure. "It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." *Terry v. Ohio*, 392 U.S. at 16, 88 S.Ct. at 1877.

U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973) (voluntariness a "question of fact to be determined from the totality of the circumstances"). Therefore, since the record clearly shows that Huberts agreed to accompany Detective Chirrick for questioning, the instant case is not controlled by *Dunaway. See, e. g., United States v. Chamberlin,* 609 F.2d 1318, 1320–24 (9th Cir. 1979); *United States v. Post,* 607 F.2d 847, 850–52 (9th Cir. 1979); *United States v. Williams,* 604 F.2d 1102, 1124 (8th Cir. 1979).

III. *THE SECOND STOP AND SUBSE-QUENT ARRESTS*

The appellants argue that the second stop of Shelley's van and subsequent arrests of both Huberts and Shelley were not justified by probable cause, because the information provided by Mrs. Carter was stale and from a questionable source. The appellants contend further that all evidence seized and used to convict them must be suppressed as the result of an illegal search.

■ Probable cause to search the van existed if the facts and circumstances known to the officers and of which they had reasonably trustworthy information would have indicated to a reasonably prudent person that the van contained evidence that could connect the appellants with counterfeiting activities. *Brinegar v. United States,* 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949); *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed.2d 543 (1925). *Cited with approval in Zurcher v. Stanford Daily,* 436 U.S. 547, 556–57, 98 S.Ct. 1970, 1976–77, 56 L.Ed.2d 525 (1978). *United States v. Peterson,* 549 F.2d 654, 660 (9th Cir. 1977); *United States v. Canada,* 527 F.2d 1374, 1379 (9th Cir. 1975), *cert. denied,* 429 U.S. 867, 97 S.Ct. 177, 50 L.Ed.2d 147 (1976). In the instant case, we must decide whether the evidence supports the trial judge's finding that there was probable cause to search the van. We find that it does.

The appellants concede that sometime shortly after Mrs. Carter's observation of what she believed to be counterfeit money and her discussion with Shelley about the appellant's counterfeiting activities there arguably was probable cause, but they insist that with the passage of two months to August 22, 1978, probable cause no longer existed. In support, the appellants cite *Durham v. United States,* 403 F.2d 190 (9th Cir. 1968). Careful analysis of *Durham,* in light of subsequent decisions and the facts here, establishes that *Durham* is not controlling. In *Durham* an affidavit on which a search warrant was based stated that the suspects had printed some counterfeit notes within recent weeks. In reversing the district court's conviction, the court reasoned that since the period during which the appellants' activities ended was at least seventeen weeks prior to issuance of the warrant, the lapse was too great to conclude reasonably that counterfeit money was present in the appellant's housetrailer or on his person when the warrant was issued. In a footnote the court stated:

"The length of time lapse alone is not controlling since even a brief delay may preclude an inference of probable cause in some circumstances while in others a relatively long delay may not do so. Nonetheless, there are obviously some limits. In *Schoeneman v. United States,* 115 U.S.App.D.C. 110, 317 F.2d 173, 177 (1963), Judge Wright noted 'that the Government could cite, and we could find, no case which sustained a search warrant issued more than 30 days after finding the evidence which constituted the basis for the search.' It has also been stated that 'a lapse of more than 7 weeks has always rendered the search warrant nugatory.' Annot., 100 A.L.R.2d 525, 527 (1965)." *Id.* at 194 n. 6.

Subsequent decisions have helped develop the contours of the staleness problem. In *United States v. Solario,* 577 F.2d 554 (9th Cir. 1978), this court, addressing staleness, stated, "where some period of time has elapsed since the occurrence of the event detailed in the affidavit, the likelihood that the object will be moved, as well as the length of time since the event occurred, will determine whether probable cause exists." *Id.* at 555. *See United States v. Collins,* 559 F.2d 561, 564 (9th Cir. 1977), *cert. denied,* 434 U.S. 907, 98 S.Ct. 309, 54 L.Ed.2d 195 (1977) and cases cited therein. *Cf. United*

*States v. Dubrofsky*, 581 F.2d 208 (9th Cir. 1978).

■ To begin with, we point out that the transcript of Mrs. Carter's Grand Jury testimony makes it clear that she informed the police that Shelley showed her the counterfeit currency and discussed the appellant's counterfeiting activities in late July 1978, only one month prior to the arrest. Thus, the time period is much shorter than the appellants claim. Further, the facts here differ from those of *Durham*. Here, the evidence points toward *ongoing* counterfeiting activities, rather than completed criminal acts as in *Durham*. Moreover, there is nothing in the record to indicate that the appellants no longer possessed or were passing the counterfeit currency. To the contrary, the evidence suggests the continuing nature of the criminal conduct. Shelley told Mrs. Carter that she and Huberts were involved in the *business* of passing counterfeit currency. She added that she and Huberts had manufactured $250,-000 in counterfeit currency in Denver. Finally, Shelley showed her mother a counterfeit twenty-dollar bill. On the basis of this evidence, we uphold the trial court's finding that probable cause existed.

In addition to the aforementioned evidence, Detective Chirrick's previous observation—a paper cutter, a carefully folded bill, and a leather briefcase matching the one used to store counterfeit currency—served to corroborate Mrs. Carter's information. *Draper v. United States*, 358 U.S. 307, 313, 79 S.Ct. 329, 333, 3 L.Ed.2d 327 (1958); *United States v. Trejo-Zembrano*, 582 F.2d 460, 463 (9th Cir. 1978), *cert. denied*, 439 U.S. 1005, 99 S.Ct. 618, 58 L.Ed.2d 682 (1978); *Long v. United States*, 422 F.2d 1024, 1026 (9th Cir. 1970).

■ We also conclude that the trial judge was not in error in having admitted Mrs. Carter's testimony concerning the appellants' counterfeiting activities. The trustworthiness of an informant's information must be evaluated in a relatively short time from the facts presented. We have previously discussed the extensive evidence before the trial judge and therefore affirm his decision. *See United States v. Sierra-*

*Hernandez*, 581 F.2d 760, 763 (9th Cir. 1978).

IV. *THE DENVER EVIDENCE AS "FRUIT OF THE POISONOUS TREE"*

The appellants argue that the discovery of the name of Lawrence Gustafson and the printing press came about as the result of using the attorney's business card. The card had been found by Agent Huebner in the leather briefcase taken from the van. The briefcase and its contents had been suppressed by the trial judge. To succeed on appeal, the appellants must establish a direct connection between the illegal search and the evidence obtained therefrom.

■ Under the "fruit of the poisonous tree" doctrine, evidence obtained as a direct result of an illegal search is barred by the exclusionary rule. *Wong Sun v. United States*, 371 U.S. 471, 488–89, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963); *accord, United States v. Lemon*, 550 F.2d 467, 472 (9th Cir. 1977). However, there are three prominent exceptions to the doctrine. One permits the introduction of evidence when the connection between the lawless conduct of the police and the discovery of the challenged evidence has "become so attenuated as to dissipate the taint." *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 267, 84 L.Ed. 307 (1939). *United States v. Ceccolini*, 435 U.S. 268, 279–80, 98 S.Ct. 1054, 1061–62, 55 L.Ed.2d 268 (1978). A second exception permits derivative evidence learned from an independent source. *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *United States v. Allard*, 600 F.2d 1301, 1304–06 (9th Cir. 1979). A third exception recognized by this circuit is the "inevitable discovery" exception. The Supreme Court recently suggested this exception in *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). In *Brewer*, the police had violated the Sixth Amendment right to counsel of an accused murderer by eliciting incriminating statements and the location of the victim's body. The Court sustained the exclusion of the incriminating statements but suggested that ad-

mission of the location and condition of the victim's body might be proper "on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited." *Id.* at 406 n. 12, 97 S.Ct. at 1243 n. 12. This court's decision in *United States v. Schmidt,* 573 F.2d 1057 (9th Cir. 1978) applied the exception in this circuit. Discussing evidence obtained as the result of illegally coerced statements, this court stated:

"Even if the search of the hull of the Santa Mercedes were considered the result of one of Schmidt's coerced statements, the resulting canister of cocaine would have been discovered by independent investigative procedures. . . .

If evidence otherwise inadmissible under the exclusionary rule, would have been discovered independently, it need not be excluded." *Id.* at 1065–66 n. 9 (numerous citations omitted).

■ In the instant case, we must consider whether the key discoveries by the police of the name of Lawrence Gustafson and of the printing press fall within either or both the "independent source" or "inevitable discovery" exceptions. We conclude the evidence obtained was admissible under both exceptions. The name of the attorney was obtained by Agent Blecha from an independent source, Mrs. Carter. The only contribution made by the business card was the correct spelling of his name, which clearly would otherwise have been discovered by the agents.

## V. CONSIDERATION OF SUPPRESSED EVIDENCE BY THE GRAND JURY

■ The appellants contend that the Grand Jury considered previously suppressed evidence in returning indictments against them. If this occurred, that evidence would be barred by the exclusionary rule and the convictions could not stand. *Wong Sun v. United States,* 371 U.S. at 485, 83 S.Ct. at 416; *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 390–92, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920); *accord, United States v. Calandra,* 414 U.S. 338, 352 n. 8, 94 S.Ct. 613, 622 n. 8, 38 L.Ed.2d 561 (1974).

Here, the Grand Jury returned two separate indictments. However, the supersed-

ing indictment of September 1979, upon which the appellants were convicted, is the one with which we are primarily concerned. The Government submitted a complete transcript of the September proceeding, which clearly establishes that no suppressed evidence was presented.

## VI. EYEWITNESS IDENTIFICATION

The Denver agents used pictures of the appellants to conduct their investigation. The appellants argue that because the agents did not use multiple photographs of different individuals, the identification process was tainted. *United States v. Ash,* 413 U.S. 300, 319–20, 93 S.Ct. 2568, 2578–79, 37 L.Ed.2d 619 (1973); *Stovall v. Denno,* 388 U.S. 293, 301–02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *Mata v. Sumner,* 611 F.2d 754, 757–58 (9th Cir. 1979); *United States v. Lewis,* 465 F.2d 959, 960–62 (9th Cir. 1972).

■ The validity of photographic identification is to be evaluated in light of the particular facts and circumstances of each case. *Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968); *United States v. Calhoun,* 542 F.2d 1094, 1104 (9th Cir. 1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 792, 50 L.Ed.2d 781 (1977). To succeed on appeal, the appellants must show that the photographic identification procedure upon which the conviction was based was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S. at 384, 88 S.Ct. at 971. They fail to sustain this burden. As the Government correctly points out, the witnesses who identified the appellants from the photographs did not identify them at trial. Further, the appellants' contentions are no more than "bald assertions." They make no showing, nor does the record contain any, of any prejudicial effect of the photographic display.

## VII. THE SUBPOENA OF GUSTAFSON

Lastly, Huberts contends that the trial court erred by failing to quash a subpoena duces tecum requiring Mr. Gustafson to testify and produce records and correspondence concerning his representation of Hu-

berts in the consignment sale of the printing press. Huberts argues that the testimony and documents sought by the subpoena came within the attorney-client privilege.

The trial judge, relying on the findings of the magistrate, determined that Mr. Gustafson was acting as a business agent rather than a legal adviser. Generally, an attorney who serves as a business agent to a client may not assert the attorney-client privilege, because no confidential relationship attaches. *Harris v. United States*, 413 F.2d 316, 320 (9th Cir. 1969); *McFee v. United States*, 206 F.2d 872, 876 (9th Cir. 1953), *cert. denied*, 350 U.S. 825, 76 S.Ct. 53, 100 L.Ed. 737 (1955). "This is one specific application of the general rule that ministerial or clerical services performed by an attorney are not within the privilege." *Harris v. United States*, 413 F.2d at 320. *Cf. In re Fischel*, 557 F.2d 209 (9th Cir. 1977). Here, Mr. Gustafson's testimony at the hearing on the motion to quash the subpoena established that his relationship with Huberts consisted of overseeing the sale of equipment. We agree with the trial judge's finding that Mr. Gustafson had not been retained to give legal advice, and therefore the attorney-client privilege does not attach.

The judgments of conviction are affirmed.