### UNITED STATES of America, Plaintiff–Appellee,

v.

### Fillipo PUGLIA, Defendant–Appellant.

### No. 92–1069.

United States Court of Appeals, Seventh Circuit.

Argued June 3, 1993.

Decided Oct. 25, 1993.

Kristina M.L. Anderson (argued) and Barry R. Elden, Asst. U.S. Atty., Office of the

---

U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Allan A. Ackerman (argued), Chicago, IL, for defendant-appellant.

Before BAUER, CUDAHY, and KANNE, Circuit Judges.

BAUER, Circuit Judge.

Fillipo Puglia was convicted of attempt to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. He appeals his conviction, raising a novel question involving the grand jury and the Fourth Amendment. We affirm the district court decision.

## I.

In late 1989, convicted drug dealer Keith Larimer began working with federal agents to arrange a purchase of cocaine from Fillipo Puglia. Larimer owed Puglia many thousands of dollars and sought to repay Puglia by brokering drug deals for him. For a while, Puglia had no cocaine to sell. In spite of that, he arranged a sale with Larimer and undercover Drug Enforcement Administration ("DEA") special agent Kirk Meyer. Before the sale, Puglia told Larimer he did not want to meet anyone else—meaning Meyer— but Puglia, Larimer, and Meyer met at a grocery store parking lot on May 31, 1990 to do the deal. Puglia, however, did not have any cocaine.

Another deal was arranged for July 10, 1990. Larimer and Puglia negotiated a $32,-000 price for the cocaine in advance. The two men, joined by Meyer, met in the same grocery store parking lot to make the sale. Larimer offered to show Puglia the money, but Puglia declined. Puglia drove out of the parking lot while Larimer and Meyer followed in another car. They went to an alley, where Puglia pulled his car over. He and Larimer both got out of their vehicles and Puglia told Larimer that he thought they were being followed. Shortly thereafter, Puglia and Larimer got back in their cars, Puglia drove away, and Larimer and Meyer again followed.

Puglia drove for a few minutes before stopping in an alley behind his home. Puglia got out of his car in front of his garage. Larimer got out to join him. Puglia asked Larimer for the money, but Larimer told him that Meyer's "brother-in-law," who was actually another DEA agent, had the money. Puglia got in his car again and drove to a nearby restaurant. As before, Larimer and Meyer followed him. Puglia made a telephone call, then joined Larimer in the restaurant. Puglia asked Larimer for Meyer's pager number so he could call him later. The men walked to Meyer's car, and Meyer called his "brother-in-law" DEA agent from the car telephone to tell him to bring the money to buy the cocaine. The second agent arrived with the money and showed it to Puglia. Puglia wanted to take the money, but Meyer would not let it go without the cocaine. Puglia became quite nervous.

The men went back to the alley behind Puglia's house. Puglia and Larimer went into a "gangway" between Puglia's house and the house just north. The men emerged from the gangway, and headed back towards the restaurant parking lot. When they got to the parking lot, Puglia was arrested. Meyer told another DEA agent that the cocaine was in Puglia's garage a short distance away. The agents performed a protective sweep of the garage and found one kilogram of cocaine that they said was in plain view. A special grand jury indicted Puglia for possession of cocaine with intent to distribute, a violation of 21 U.S.C. § 841(a)(1). Puglia moved to suppress the cocaine seized from the garage. The district court accepted the recommendations of a magistrate-judge and held that the search violated the Fourth Amendment. The government did not appeal that decision, but presented the case to another grand jury that returned a superseding indictment charging Puglia with *attempt* to possess with intent to distribute cocaine, a violation of 21 U.S.C. § 846. This charge imposes the same penalties as those carried by the offense that was the object of the attempt.

Puglia raises an interesting question about the use of illegally seized evidence before the grand jury. He claims that suppressed evidence cannot be used to secure a superseding indictment. When this possibility is raised,

he argues, the district court's decision not to conduct an *in camera* review of the grand jury proceedings is an abuse of discretion and warrants a remand. He argues that the trial court abused its discretion when it refused to review grand jury transcripts that resulted in the superseding indictment after the *sine quo non* of the original indictment had been suppressed.

## II.

■ Grand Jury proceedings are cloaked in secrecy. Rule 6(e)(3)(C)(ii) of the Federal Rules of Criminal Procedure allows disclosure of grand jury proceedings "when permitted by a court at the request of the defendant, upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Puglia must show a particularized need for the review to overcome the presumption of secrecy embodied in the grand jury process. *Lucas v. Turner*, 725 F.2d 1095, 1102–09 (7th Cir.1984).[1]

■ Puglia claims that the probability exists that the evidence presented to the grand jury was seized in violation of the Fourth Amendment of the United States Constitution, and that if his supposition is true, the indictment must be dismissed. The Supreme Court has addressed the question of whether evidence obtained as a result of a Fourth Amendment violation may be presented to a grand jury to secure an indictment. In *United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the defendant was the subject of a search by law enforcement officials looking for evidence of a bookmaking operation. After the search, the defendant was subpoenaed to testify before the grand jury. He refused, citing his Fifth Amendment right to be free from self-incrimination. In response, the government offered the defendant transactional immunity which spared him from self-incrimination and required him to testify before the grand jury. Meanwhile, the district court granted the

defendant's suppression motion. The district court held that because the information on which the grand jury questions were based was predicated on unlawfully seized evidence, the defendant was not required to testify. The Sixth Circuit affirmed. *Id.*

The Supreme Court reversed. It explained that the exclusionary rule was a judicially created remedy intended to deter law enforcement officials from Constitutional violations by preventing the use of the illegally obtained evidence in a criminal trial. The Court stated that "[a]ny incremental deterrent effect which might be achieved by extending the rule to grand jury proceedings is uncertain at best. Whatever deterrence of police misconduct may result from the exclusion of illegally seized evidence from criminal trials, it is unrealistic to assume that application of the rule to grand jury proceedings would significantly further that goal." *Calandra*, 414 U.S. at 351, 94 S.Ct. at 621. The Court held that the exclusionary rule did not apply and that the defendant could not avoid testifying on Fourth Amendment grounds. *Id.*

The Court limited the breadth of its holding, however, when it noted that the grand jury could not invade a legitimate privacy interest protected by the Fourth Amendment, before the wrong occurs. *Id.* at 346, 94 S.Ct. at 619 ("A grand jury's subpoena *duces tecum* will be disallowed if it is 'far too sweeping in its terms to be regarded as reasonable' under the Fourth Amendment.' "). The Court also distinguished its holding from an earlier Supreme Court decision, *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). In that case, the Silverthornes were the subject of an unlawful search that resulted in the seizure of a number of documents. The documents were presented to a grand jury that had already indicted the Silverthornes and their company. The district court ordered the government to return the original documents, but not the photocopies. The grand jury later issued a *subpoena*

1. Puglia argues that the "particularized need" standard applies when the defendant asks to review the grand jury materials directly, but that the same standard has not been articulated when the defendant requests the district court to per-

form an *in camera* review. Because our holding is based on other grounds, we do not find it necessary to address this aspect of Puglia's argument.

*duces tecum* to the Silverthornes ordering production of the originals. The Silverthornes refused and were charged with contempt. The Supreme Court stated that the subpoenas were invalid because they were based on information garnered through evidence seized in violation of the Fourth Amendment. *Id.*

Although relegating it to a footnote, the Court in *Calandra* distinguished *Silverthorne* because 1) the illegally seized evidence in *Silverthorne* had already been suppressed by the time the subpoena was issued; 2) the Silverthornes were not criminal defendants; and 3) the grand jury did not need the fruits of the illegally seized evidence to perform its investigative or accusatorial functions. *Calandra*, 414 U.S. at 352 n. 8, 94 S.Ct. at 622 n. 8. Moreover, in *Calandra*, the defendant's challenge to the grand jury's use of the information would have interrupted the grand jury proceedings. *Id.* The Supreme Court reserved the question we face in this case: whether previously-suppressed evidence can be presented to a grand jury considering a superceding indictment on the same criminal conduct.

The reservation in *Calandra* and the holding in *Silverthorne* seem to indicate that the violation Puglia raises would be enough to dismiss the indictment and therefore enough to meet the standard necessary to produce the grand jury documents for *in camera* review. But a closer look at the matter is required.

In *Calandra*, the Court held that government wrong—the illegal search—could not be remedied by denying the grand jury the opportunity to consider the fruits of the illegal conduct. The Court stated that "[q]uestions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong. Whether such derivative use of illegally obtained evidence by a grand jury should be proscribed

presents a question, not of rights, but of remedies." *Calandra*, 414 U.S. at 354, 94 S.Ct. at 623. The Court noted that "[a]s with any remedial device, the application of the [exclusionary] rule has been restricted to those areas where its remedial objectives are thought most efficaciously served." *Calandra*, 414 U.S. at 348, 94 S.Ct. at 620.

Several circuit courts have considered whether those objectives are efficaciously served when determining whether suppressed evidence should be presented to the grand jury. The Eleventh Circuit declined to apply the exclusionary rule to grand jury proceedings in *In re Grand Jury Proceeding*, 842 F.2d 1229, 1231–32 (11th Cir.1988). In that case, the recipient of a *subpoena duces tecum* challenged its validity because it allegedly resulted from information seized in a search that violated the Fourth Amendment. The court held that the benefits of applying the exclusionary rule to the grand jury proceedings were overshadowed by the cost to the grand jury's investigatory process. The court found that a hearing would be necessary to determine whether the exclusionary rule was applicable and that the delay caused by that hearing would be detrimental. The court also found that the goal of deterring unlawful police conduct is served only minimally by applying the exclusionary rule to grand jury proceedings. *Id.* The court held, therefore, that the subpoena could not be quashed.

The Third Circuit also declined to apply the exclusionary rule to grand jury proceedings in *United States v. Busk*, 730 F.2d 129, 130 (3d Cir.1984). In that case, however, the Third Circuit did not consider whether previously-suppressed evidence could be presented to the grand jury. The court's holding was limited to evidence that was suppressed after the indictment The court held that later-suppressed evidence cannot serve as a basis for dismissal of an indictment. *Id.*[2]

2. In an earlier case, *In re Grand Jury Proceedings*, 550 F.2d 1240 (3d Cir.1977), the Third Circuit considered whether an alleged Fourth Amendment violation could excuse a witness from testifying before the grand jury. The district court had previously held that a search of the witness' home was not in violation of the Fourth Amendment. Nonetheless, the witness refused to testify because the subject of the grand jury inquiry resulted from that search. The Third Circuit held that *Calandra* controlled their decision because, *inter alia*, the search had not been judicially determined to be unconstitutional.

We have found only one circuit that has held that previously-suppressed evidence cannot be used in subsequent grand jury proceedings. In *United States v. Huberts*, 637 F.2d 630, 638–39 (9th Cir.1980), the Ninth Circuit stated that previously suppressed evidence cannot be presented to the grand jury to secure an indictment and would require dismissal of the indictment, but a review of the grand jury transcripts revealed that the previously-suppressed evidence had not been presented to the grand jury. *Id.* Unlike the Third and Eleventh Circuit cases which limit judicial supervision in grand jury proceedings, the Ninth Circuit extended judicial supervision in holding that consideration of previously-suppressed evidence is a sufficient basis for dismissal of an indictment.

The question, then, is how far does the limit on judicial supervision extend? The Supreme Court considered the extent to which a district court can exercise supervisory powers over the grand jury in *United States v. Williams*, — U.S. —, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992). In that case, the defendant argued that the prosecutor did not heed a precedential rule in that circuit that required presentation of substantial exculpatory evidence to the grand jury. The defendant wanted the indictment dismissed. The Supreme Court held that a violation of a circuit-wide judicial rule is not enough to invoke the limited supervisory powers that the district court has over the grand jury proceedings. The Court held that these supervisory powers may be used to dismiss an indictment only when there has been a violation of the few, clear rules established by Congress or cases from the Supreme Court that ensure the integrity of the grand jury function. *Id.*, — U.S. at —, at 1741 (citations omitted). The Court noted that many constitutional protections afforded defendants in criminal proceedings have no application to grand jury proceedings because the grand jury is an accusatory, not adjudicatory, body. *Id.*, — U.S. at —, at 1742–43.

*Williams* indicates that the court does not have the power to dismiss an indictment based on Fourth Amendment violations. Therefore, the grand jury's alleged use of previously-suppressed evidence does not create a requirement that the court conduct an *in camera* review pursuant to Rule 6(e)(3)(C)(ii). The "few, clear rules established by Congress or cases from the Supreme Court" do not call for dismissal under the facts in this case. *Cf. Williams*, — U.S. at —, 112 S.Ct. at 1741.

To begin with, the grand jury is allowed to consider a wide range of evidence. It may consider incompetent evidence and act on rumor or the grand jurors' personal knowledge. *See Calandra*, 414 U.S. at 344, 94 S.Ct. at 618. In addition, the grand jury also may act on evidence obtained in violation of a defendant's Fifth Amendment rights if that violation was not at the hands of the grand jury returning the indictment. *Lawn v. United States*, 355 U.S. 339, 348, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958). We hold that a Fourth Amendment violation that did not occur at the hands of the grand jury returning the indictment should not bar use of that evidence by the grand jury.

We are left with only one reason to disallow grand jury use of previously-suppressed evidence: to deter unlawful acts by law enforcement officials. Although an effective reason in the trial context, we believe that the *Calandra* Court identified the weakness of this argument when it is applied to the grand jury. Prosecutors will not waste their time seeking indictments of individuals against whom they do not have enough evidence to convict. *See Calandra*, 414 U.S. at 351, 94 S.Ct. at 621.

Because the primary purpose of the exclusionary rule is to deter future Fourth Amendment violations rather than to redress Puglia's privacy injury, and because excluding the evidence will be unlikely to have any significant deterrent effect, use of previously-suppressed evidence in a grand jury investigation does not state grounds for dismissal of an indictment. For that reason, the district court did not abuse its discretion when it denied the *in camera* review of the grand jury proceedings.

■ Puglia raises one final argument. He claims that the district court erred when it admitted allegedly prejudicial evidence that related to uncharged conduct in violation of

Federal Rule of Evidence 404(b).[3] The government filed a supplemental motion *in limine* asking to establish that Larimer owed Puglia a debt from prior drug transactions. (R. 51). The district court denied the motion and ordered that the government could only establish that Larimer owed Puglia a debt. Larimer was barred from testifying about how the debt was incurred. (R. 59).

Puglia claims that the district court's ruling laid the groundwork for comments made by the two government attorneys during closing and rebuttal arguments about the source of the debt. During closing argument, one of the prosecutors asked rhetorically how the $16,000 debt could have been accumulated. (Tr. 240–41). In his closing argument, Puglia's attorney did not discuss the debt. Yet in rebuttal, the other prosecutor ignored the district court's order and stated that the jury could "infer what the basis of that debt is and that that debt was probably a prior drug debt." (Tr. 258). Puglia's attorney did not object to either of the prosecutors' statements. Therefore, his challenge to those comments is reviewed for plain error. *United States v. Badger*, 983 F.2d 1443, 1450 (7th Cir.1993). Puglia also complains that the district court should have given the jury a limiting instruction to temper the alleged harm wrought by the prosecutor's comments.[4]

This issue is whether Puglia, in light of his failure to object to the prosecutor's comments, was prejudiced to the extent that a fundamental miscarriage of justice will occur if his conviction is not reversed. Under this plain error analysis, Puglia does not succeed. The case against Puglia was rock solid. Larimer and several DEA agents delivered damning testimony against him. Moreover, the prosecutor's statement about the source of Larimer's debt simply articulated an infer-

ence that was unmistakable. The evidence showed that Larimer and Puglia had a prior relationship and that they were comfortable working together, unlike Puglia's hesitation to work with the newcomer, Agent Meyer. The inference was also clear that the men were familiar with cocaine transactions. Any error here was harmless.

### III.

Fillipo Puglia's conviction is AFFIRMED.

CUDAHY, Circuit Judge, concurring.

Although the matter is not entirely clear, the majority seems to suggest that the factual distinctions drawn in footnote 8 of *Calandra*, 414 U.S. 338, 352 n. 8, 94 S.Ct. 613, 622 n. 8, 38 L.Ed.2d 561 (1974), which distinguish that case from *Silverthorne*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), are not controlling here. Instead, we should be guided by two policy considerations: (1) the desirability of limiting judicial supervision of grand juries and (2) the minimal deterrent effect of applying the exclusionary rule to previously suppressed evidence before the grand jury. *Ante* at 482–483.

Footnote 8 of *Calandra* distinguished *Silverthorne* on three bases: (1) In *Silverthorne*, the defendants had already been indicted and could therefore invoke their status as criminal defendants in claiming the protection of the exclusionary rule, (2) the government's interest in the documents in question there was based on their potential use in a criminal trial already authorized and were of no further use in carrying out the grand jury's investigative or accusatorial functions, and (3) there had been a prior judicial determination that the documents in question had been obtained in an illegal search and there-

**3.** Rule 404(b) states:

    **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable

    notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b).

**4.** Puglia did not develop any argument that a limiting instruction should have been given to the jury. Nor did he indicate whether a limiting instruction was offered. Therefore, we will not consider this issue.

fore suppression of the documents would not require interruption of ongoing grand jury proceedings. All of these circumstances in which *Silverthorne* differs from *Calandra* are also found in the present case. Here we have criminal defendants seeking to disallow the grand jury's use of documents that are potentially useful in a criminal trial and where the disallowance would not interrupt ongoing grand jury proceedings. Therefore, if *Silverthorne* is controlling, there seems to be a plausible case for dismissal of the superseding indictment. Since *Silverthorne* is the work of Justice Oliver Wendell Holmes, we should pause respectfully before looking beyond it.

That having been said, however, I think the majority's application of a more policy-oriented analysis here is permissible—at least in reviewing for abuse of discretion. Based on other authority cited by the majority, *ante* at 481–482, I think we need not feel compelled by *Silverthorne* to order dismissal of the indictment.