711 P.2d 579

**STATE of Arizona, Appellee,**

v.

**Sandra Kay WINEGAR, Appellant.**

**No. 6131.**

Supreme Court of Arizona,
En Banc.

Dec. 4, 1985.

Robert K. Corbin, Atty. Gen., William J. Schafer III, Chief Counsel, Crim. Div., Gary A. Fadell, Asst. Atty. Gen., Phoenix, for appellee.

George F. Klink, Phoenix, for appellant.

GORDON, Vice Chief Justice.

A jury convicted defendant, Sandra Kay Winegar, of first degree murder, A.R.S. § 13–1105; and armed robbery, A.R.S. § 13–1904. The trial court subsequently sentenced her to concurrent terms of life imprisonment for the murder and 10.5 years for the robbery.

On September 2, 1982, the body of a black male was found in the desert north of Phoenix. Sheriff's detectives later determined that the body was that of Dorzee "Bubba" Hill. Hill was a known heroin dealer who worked the "Buckeye Strip", an area of Buckeye Road in Phoenix bordered by 7th and 15th Avenues.

An autopsy determined that Hill died from a blow to the head made by a blunt instrument. Laboratory analysis of physical evidence found on Hill's body revealed the presence of cat hairs and hairs from a Caucasian person. Sheriff's detectives surmised that Hill was not killed in the desert but was murdered elsewhere and transported to the desert by car and dragged by more than one person to its place of discovery behind some bushes.

Further investigation led sheriff's detectives to believe that defendant and her

boyfriend, Thomas Boyd Tittle,[1] were involved in the murder. Sheriff's detectives Al Weiss and Ralph Dominguez located defendant and Tittle in Hagerman, Idaho, defendant's home town. Dominguez and Weiss traveled to Hagerman where, on September 22, 1982, they contacted defendant and Tittle. After approximately four hours of questioning, defendant implicated herself and Tittle in the murder of Dorzee Hill.

Defendant's confession was admitted at trial over her objections. The state also called Jack Henry pursuant to a grant of immunity. Henry testified that he and Tittle had discussed a plan in which they would beat Dorzee Hill and rob him of his drugs and money. Defendant was present when Henry and Tittle planned the killing. No explanation was given for the failure to carry out this plan.

In her defense, defendant recanted her confession, and she said she was tricked into helping Tittle murder Hill. She also testified that she told Tittle not to beat Hill, that she did not know Tittle would use an axe on Hill, and that she had no intent to aid Tittle.

Defendant raises numerous issues, but because of our disposition of the case we need only decide one. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031 and –4032.

## I

Defendant contends that her confession resulted from an illegal arrest, and, therefore, should have been suppressed at trial. The state argues that defendant voluntarily agreed to accompany law enforcement authorities and answer their questions, hence no arrest occurred. Thus, the state contends, defendant's confession was admissible as the product of a consensual encounter with the sheriffs.

The existence of an arrest depends upon the circumstances surrounding defendant's contact with the sheriffs, *see* authorities cited *infra*, and therefore we must examine the facts in some detail.

After finding Hill's body, Detectives Weiss and Dominguez went to the Buckeye Strip, interviewed several witnesses and learned the following. Defendant and her boyfriend, Thomas Boyd Tittle,[2] with whom she shared an apartment, were daily heroin users who frequented the Buckeye Strip and regularly bought heroin from Dorzee Hill. Tittle disliked Hill because Hill sold bad heroin that made defendant sick and also made frequent sexual advances toward defendant. Tittle had talked to Jack Henry about getting revenge on Hill by beating him over the head with a tire bat and then taking his drugs and money. Tittle said he wanted Henry's help in carrying out the plan. The day before Hill's body was found, defendant and Tittle had a heated argument with Hill outside a social club. Defendant and Tittle were both known to carry .25 caliber automatic pistols, and they also owned a black and white cat. Cat hairs were found on Hill's body. In addition, hair from a Caucasian person was found on Hill, and both defendant and Tittle are Caucasian. After Hill's body was found, defendant and Tittle found out that the police were asking questions on the Buckeye Strip and were looking for two white people who bought heroin from Dorzee Hill. Shortly thereafter, defendant and Tittle left town together.

Based upon this information, Detectives Weiss and Dominguez decided they wanted to talk to defendant and Tittle. A nationwide communication to law enforcement authorities resulted in locating defendant and Tittle in Hagerman, Idaho, where defendant was visiting her parents. After arriving in Idaho, Detectives Weiss and Dominguez obtained a search warrant for

---

1. In a separate trial, Tittle was convicted of Hill's murder and sentenced to death. On appeal his conviction was reversed and a new trial granted. *State v. Tittle,* 147 Ariz. 339, 710 P.2d 449 (1985).

2. At this time the sheriffs believed Tittle's name was Pat Easley, but they later learned his true name. For ease of identification, the name Tittle will be used throughout the opinion.

defendant's car and her parents' house. Believing they had no probable cause to arrest defendant or Tittle, however, the detectives merely desired to speak with them and characterized the two as "investigative leads".

On September 22, 1982, defendant and Tittle were observed walking down the main street of Hagerman. Accompanied by four armed and uniformed Gooding County Sheriffs, Detectives Weiss and Dominguez, in plain clothes, approached and encircled defendant and Tittle. Weiss informed defendant and Tittle of his identity and ordered the two to keep their hands away from their bodies and not to move. A pat-down search of Tittle was performed and a .25 caliber automatic pistol was retrieved. During the search, defendant was told to step away from Tittle and Detective Dominguez stood next to her. No search of defendant was performed at that time.

The detectives stated that they wanted to talk with defendant and Tittle away from the street. The two then accompanied the deputies to the Hagerman City Hall across the street. While on the street defendant was never told whether she was under arrest or not under arrest.

Once at the City Hall, Detective Dominguez informed defendant that he wanted to talk to her about a Phoenix murder. He also told her that she was not under arrest. Nevertheless, Kathy Mynard, the wife of one of the Gooding County Sheriffs, arrived on the scene and conducted a pat-down search of defendant, finding no weapons. Kathy Mynard was often hired by the Gooding County Sheriff to act as a matron when the Gooding County Sheriffs had women prisoners. According to Kathy Mynard, she went to the back room of the City Hall and told defendant that she, Mynard, was there to search defendant. Defendant said "OK." The search completed, Dominguez and other law enforcement officers decided the Hagerman City Hall was too small and crowded to conduct a proper interview of defendant and Tittle. Dominguez asked defendant if she would accompany him and the officers to Gooding, Ida-

ho, a town twenty miles from Hagerman where facilities existed for interrogation. Defendant asked if the deputies wished her to drive her own car to Gooding. Weiss said she could not because a search of the car pursuant to a search warrant was to be conducted. Defendant was then asked if she had an alternative form of transportation, and she said no. The deputies then asked defendant if she would accompany them to Gooding in their vehicle. Defendant consented and, in fact, was somewhat relieved to be going to Gooding so as to avoid embarrassment in her home town. Detective Weiss told defendant and Tittle that they would be driven back to Hagerman after the interviews were completed.

Defendant accompanied Detectives Dominguez and Weiss and Kathy Mynard to Gooding in a Gooding County Sheriff's car. Tittle was taken to Gooding in a different car. There, defendant was brought to the Gooding County Sheriff's Office, where Detective Dominguez began interviewing defendant in a conference room. Detective Weiss interviewed Tittle in a separate room. At the outset, Dominguez informed defendant that she was not under arrest but nonetheless read defendant her *Miranda* rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant stated that she understood these rights, and she signed the "rights card" Dominguez read to her.

When the substance of the interview began, defendant denied any knowledge of the murder. Accordingly, Dominguez testified that, at that point, defendant was free to go. Nevertheless, Dominguez did not let defendant go. Rather, he told defendant that she could "probably" drive her car home "if she was telling me the truth." In addition, Kathy Mynard stood in constant guard at the door of the interview room, and she accompanied defendant to the restroom the several times defendant went there.

After defendant's initial denial, Detective Dominguez informed defendant of the information gathered on the Buckeye Strip. Defendant then changed her story, stating

that Tittle had admitted to her that he killed Hill. At this time, Dominguez told defendant that there was only a possibility she could be released once the information in her second statement was verified. Shortly after this statement, defendant was allowed to meet briefly with Tittle, and defendant informed Tittle that she had told "everything". After the two were again separated, Tittle implicated both himself and defendant. Armed with Tittle's statement, detective Weiss confronted defendant and accused her in a raised voice of being a liar. Defendant then changed her statement and implicated herself and Tittle in the murder. By the time she made this statement, defendant had been in the Gooding County Sheriff's Office for approximately four hours.

Defendant maintains that an arrest occurred when the sheriffs approached and stopped Tittle and her on the street in Hagerman. She contends that this arrest continued in Hagerman and in Gooding. Further, defendant argues, since no probable cause existed to arrest her, the confession was the fruit of an illegal arrest and should have been suppressed at trial. *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). We agree.

A confession is admissible against a defendant if it is the product of a valid arrest, see *Brown v. Illinois, supra; Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), or if, absent arrest, the statement is voluntarily given. *California v. Beheler*, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *United States v. Mendenhall*, 466 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980). An involuntary, coerced confession must, of course, be suppressed under all circumstances. *Brown v. Illinois, supra.*

The state concedes that probable cause to arrest the defendant did not exist at the time of the initial stop in Hagerman, and we are bound by that concession.[3] However, this determination merely begins, rather than concludes, our inquiry.

The defendant argues that because probable cause did not exist to arrest the defendant, the arrest was invalid and her subsequent confession must be suppressed. *See, e.g., Taylor v. Alabama*, 457 U.S. 687, 102 S.Ct. 2664, 73 L.Ed.2d 314 (1982); *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); *Brown v. Illinois, supra.* This argument presupposes, of course, that there was an arrest. The state, in turn, argues that there was no arrest and thus the incriminating statement was voluntarily given; or, in the alternative, that the statement was sufficiently removed from the illegal arrest to dissipate the taint.

## II

We are urged by the state to adopt the finding of the trial court that "[t]he statement ... was voluntarily made and not the result of any force, threats, promises, undue influence or misrepresentations." The state argues that absent clear and manifest error, the trial court's ruling on this issue should not be reversed. *See State v. Smith*, 136 Ariz. 273, 665 P.2d 995 (1983).

We agree with the state that the trial court's determination of voluntariness should be sustained absent clear and manifest error. However, the question of whether an illegal arrest occurred and the subsequent implications for admissibility are mixed questions of fact and law dissimilar from the question of voluntariness. As a preliminary matter we must establish the

---

**3.** The state maintains that the issue in this case is whether defendant's confession was freely and voluntarily made. We disagree. The issue here is not whether defendant freely and voluntarily confessed. It is whether the confession was the fruit of an illegal arrest. Obviously, a confession must also be voluntary if it is to be admissible. *Brown v. Illinois, supra.* Mere voluntariness under *Miranda*, however, will not render admissible a confession obtained as the result of an illegal arrest. *Id.* See also *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *State v. Reffitt*, 145 Ariz. 452, 702 P.2d 681 (1985). We make no decision at this time regarding whether probable cause existed to arrest Tittle at the time of the Hagerman stop.

standard of review which we apply to trial court determinations of arrest and admissibility issues.

This Court traditionally gives great deference to trial court determinations of conflicting procedural, factual or equitable considerations. This is because the trial judge "has a more immediate grasp of all the facts of the case, an opportunity to see the parties, lawyers and witnesses, and ... can better assess the impact of what occurs before him." *State v. Chapple*, 135 Ariz. 281, 297 n. 18, 660 P.2d 1208, 1224 n. 18 (1983). Where, however, the facts are established, the resolution of the question is one of law or logic. "Then it is our final responsibility to determine law and policy and it becomes our duty to 'look over the shoulder' of the trial judge and, if appropriate, substitute our judgment for his or hers." *Id.*

In the instant case the question is a mixed one of fact and law. That is, "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory [or constitutional] issue, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Pullman Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982).

When presented with such a mixed question, we will, of course, give great deference to the trial court's factual determination. Although the trial court must establish the facts underlying a warrantless arrest determination, the ultimate legal conclusion is properly addressed by the appellate as well as the trial courts. *See United States v. McConney*, 728 F.2d 1195 (9th Cir.1985). The trial court's factual determinations are, of course, entitled to great deference, but the legal conclusions to be drawn from these facts with regard to whether a warrantless arrest occurred are especially susceptible of appellate review. The arrest issue requires us to look to a well-defined body of law concerning the relevant constitutional standard. *See id.* It "requires us to consider abstract legal doctrines, to weigh underlying policy considerations, and to balance competing legal interests." *Id.* at 1205. Specifically, we must decide how far police officers can go in contacting and questioning suspects before such activities violate the suspect's important Fourth Amendment right to be free of unreasonable seizures.

■ Consequently, in the instant case, we will "look over the trial court's shoulder" in determining whether the arrest issue was correctly decided. *See State v. Chapple, supra.*[4] Thus the issue is squarely joined: was there an arrest of the defendant?

## III

■ The stop on the street in Hagerman was a seizure for Fourth Amendment purposes. Defendant and Tittle were encircled by six police officers, were told to keep their hands away from their bodies, and were told to keep still. Their freedom of movement was restricted. *See Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968) ("whenever a peace officer accosts an individual and restrains his

---

**4.** By this determination, we do not decide the standard of review of other mixed questions of law and fact. We also do not change the longstanding rule that the trial court's determination that a confession was voluntarily given is reversible only upon clear and manifest error, *see* text, *supra*, at 584; *State v. Hensley*, 137 Ariz. 80, 669 P.2d 58 (1983). Yet even if we were to defer to the trial court determination in this case it would not conclude our inquiry. The trial court apparently misunderstood the limited role played by voluntariness in Fourth Amendment analysis. "[A] finding of 'voluntariness' for purposes of the Fifth Amendment is

merely a threshold requirement for Fourth Amendment analysis." *Taylor v. Alabama, supra*, 457 U.S. at 690, 102 S.Ct. at 2667. *Accord, State v. Reffitt, supra*, 145 Ariz. at 458, 702 P.2d at 687. *See also Oregon v. Elstad*, ⸺ U.S. ⸺, ⸺, 105 S.Ct. 1285, 1292, 84 L.Ed.2d 222 (1985) ("the Fourth Amendment [has] traditionally mandated a broad application of the 'fruits' doctrine. The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits.") (O'Connor, J.) Thus even voluntary statements may be suppressed when obtained in violation of the Fourth Amendment.

freedom to walk away, he has 'seized' that person").

■ We believe, however, that although there was no probable cause to arrest the defendant, this initial seizure was a constitutional *Terry* stop. *See Terry v. Ohio,* *supra.* In *Terry* and subsequent cases, the United States Supreme Court has held that, "consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances." *United States v. Hensley,* — U.S. —, —, 105 S.Ct. 675, 679, 83 L.Ed.2d 604 (1985). Furthermore, in *Hensley,* for the first time, the Court explicitly ruled that police officers could perform *Terry* stops on persons suspected of *past* crimes. *Id.* at —, 105 S.Ct. at 680–681. Although the Court noted that the traditional justifications for allowing *Terry* stops are somewhat attenuated with respect to temporary detentions to investigate suspicion of past criminal activity, — U.S. at —, 105 S.Ct. at 681, it nonetheless decided that the public interest in solving crime compelled the conclusion that, "if police have a reasonable suspicion, grounded in specific and articulable facts, that a person they encounter was involved in or is wanted in connection with a completed felony, then a *Terry* stop may be made to investigate that suspicion." *Id.*

The stop in the instant case conformed to the *Hensley* standards. Prior to the stop in Hagerman, sheriff's detectives knew of defendant's and Tittle's daily heroin use on the "Buckeye Strip"; their regular purchases of heroin from the victim Hill; Tittle's dislike of Hill and his plan to attack and rob him; the heated argument defendant and Tittle had with Hill; defendant and Tittle's departure from Phoenix soon after they learned the police were on their trail; defendant's and Tittle's pet cat and the cat hairs found on Hill's body; hairs from a white person found on Hill's body; the probability that two persons dragged Hill's body into the desert; and defendant's and Tittle's propensity to carry .25 caliber automatic pistols.

This information amounts to "a reasonable suspicion, grounded in specific and articulable facts. . . ." that defendant was involved in a completed felony. Though the information tended to implicate Tittle much more than defendant, it revealed the close association of Tittle and defendant and their common motive for wanting to kill Hill. Inasmuch as it appeared the murder was committed by two people, police could reasonably suspect defendant had some involvement in the murder.

However, the initially valid *Terry* stop became an illegal arrest when the defendant was moved from the street to the City Hall. Contrary to the state's assertions, we do not believe that the movement to City Hall was a necessarily concomitant extension of the *Terry* stop, or alternatively, that it was voluntary.

■■ First, we cannot accept the argument that the movement to City Hall was merely the continuation of a valid *Terry* stop. A full *Terry* stop could have been performed on the street in Hagerman. We see no reason why, if a police officer reasonably suspects that there may be a concealed weapon, he cannot perform a weapons frisk of a woman on the spot. While we recognize that the police officers were simply trying to protect the sensibilities of the defendant by providing a woman to perform the pat-down in a more private setting, these sensibilities must be temporarily subordinated to the exigencies of a *Terry* stop where, as here, strong evidence exists that the woman may be armed. Since a *Terry* stop cannot be initiated without a reasonable and articulable suspicion, an officer is justified in performing an immediate weapons pat-down if he reasonably suspects a weapon may be found. *Terry v. Ohio, supra.* The pat-down of Tittle revealed a .25 caliber pistol; hence a pat-down of the defendant would have been reasonable. After the pat-down was completed, the detectives could have briefly questioned defendant regarding the Hill murder. Nothing in the record indicates why the Hagerman street was not suitable for these purposes.

*Terry* stops are tolerated as an exception to the probable cause requirement of the Fourth Amendment because they are brief and as narrowly circumscribed as possible. *See Dunaway v. New York, supra,* 442 U.S. at 212, 99 S.Ct. at 2256. After briefly searching and questioning the defendant on the street, the police either should have arrested her if probable cause had arisen, or, since none did, should have released her. *Cf. Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of the stop; investigative methods employed should be the least intrusive means reasonably available to dispel the officer's suspicions in a short period of time).

Instead, the police did neither. At this point the *Terry* stop was abrogated. *Terry* stops cannot continue beyond "the purposes of limited inquiry and weapons frisk." *United States v. Beck,* 598 F.2d 497, 500 (9th Cir.1979). We cannot approve an "extended" *Terry* stop, since "duration is an essential element in determining whether the initially lawful intrusion takes on the characteristics of an unlawful detention." *United States v. Huberts,* 637 F.2d 630, 636 (9th Cir.1980).

Nor do we believe that *Hensley,* by approving *Terry* stops to investigate suspected past criminal behavior, expanded the permissible bounds of police behavior first delimited in *Terry.* Although "[t]he precise limits on investigatory stops to investigate past criminal activity are ... difficult to define....", *United States v. Hensley, supra,* — U.S. at —, 105 S.Ct. at 680, *Terry* stops have always been regarded as "limited exceptions to the general rule that seizures of the person require probable cause to arrest." *Florida v. Royer, supra,* 460 U.S. at 500, 103 S.Ct. at 1325. Thus, though "[t]he scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each

case ... an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Id.*[5] In this case the scope of the intrusion exceeded that tolerated short of arrest.

The state argues as an alternative that even if there was no extended *Terry* stop, the movement to City Hall was voluntary and thus cannot be termed an arrest.

We concede that law enforcement authorities can transform *Terry* stops into purely voluntary encounters between citizens and police officers. "When an officer is justified in stopping a suspect for questioning, the stop does not become an arrest if, in the absence of protest or coercion, the officer directs the person to an interview room for questioning." *United States v. Huberts, supra,* 637 F.2d at 636; *see also United States v. Mendenhall, supra.*

Under the coercive circumstances of this encounter, however, we do not believe that the defendant's consent to go to City Hall can realistically be characterized as voluntary. Defendant was surrounded by six armed police officers, told to keep her hands away from her body, and told to step away from Tittle, who was then frisked. At this point, none of the six officers gave any indication that the defendant was not under arrest or free to leave. The mere fact that a police officer "asks" a citizen to accompany him rather than commands obedience does not mean that a citizen can reasonably believe he is free to refuse. Often the very circumstances surrounding the question supply its inevitable answer. We believe that the defendant's acquiescence signified not voluntary consent, but rather acceptance of an unavoidable course of conduct. Since the defendant's movement to City Hall was not voluntary, it denotes the commencement of an illegal arrest.

An arrest is complete when the suspect's liberty of movement is interrupt-

---

5. Like the Supreme Court, we will not attempt to delineate the precise moment at which a valid *Terry* stop is transformed into an arrest. Such a determination is necessarily dependent

upon the particular circumstances. *Florida v. Royer, supra.* It is sufficient to say that in this case the allowable parameters were crossed upon the defendant's removal to City Hall.

ed and restricted by the police. *State v. Green*, 111 Ariz. 444, 532 P.2d 506 (1975). Whether the defendant has been arrested is to be tested by the objective evidence and not by the subjective beliefs of the parties. *Id.* Thus, neither defendant's subjective belief that she was under arrest nor the police officer's impressions that defendant was free to go are relevant in making the arrest determination. Indeed, "[a] certain set of facts may constitute an arrest whether or not the officer intended to make an arrest and despite his disclaimer that an arrest occurred." *Taylor v. Arizona*, 471 F.2d 848, 851 (9th Cir.1972).

Failure to observe the mechanical formalities of an arrest does not preclude finding that an arrest occurred. Whether an arrest occurs for purposes of the Fourth Amendment does not turn upon any formalistic word contest. As noted by the Supreme Court, "[t]he application of the Fourth Amendment's requirement of probable cause does not depend on whether an intrusion of this magnitude is termed an 'arrest' under state law." *Dunaway v. New York*, *supra*, 442 U.S. at 212, 99 S.Ct. at 2256. The issue turns upon an evaluation of all the surrounding circumstances to determine whether a reasonable person, innocent of any crime, would reasonably believe that he was being arrested. *United States v. Beck, supra; State v. Waicelunas*, 138 Ariz. 16, 672 P.2d 968 (App. 1983).

The defendant was surrounded by police officers, deprived of her liberty of movement, and watched her companion be frisked. Defendant was then asked to accompany the officers across the street for further questioning. "These circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.'" *Florida v. Royer*, *supra*, 460 U.S. at 501, 103 S.Ct. at 1326, *quoting United States v. Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497. At this point the defendant was under arrest for purposes of Fourth Amendment analysis.

The events in Gooding did not dispel the aura of arrest. Though told again that she was not under arrest, numerous actions by the sheriffs contradicted this statement. Defendant was never told she was free to leave. *See id.*[6] She was kept under constant supervision, either by Detective Dominguez, who interrogated her, or by Kathy Mynard, who stood guard at the interview room and accompanied defendant to the restroom the several times she went there.[7] Moreover, even after defendant gave her first exculpatory statement, she was not told she was free to leave. Indeed, she was told she could *probably* drive her car home *if* she was telling the truth. In addition, after her second statement, Detective Dominguez told defendant that there was only a possibility that defendant could be released when the information in her second statement was verified. As it turned out, defendant was kept in Gooding for approximately four hours where she was continually interrogated, supervised, and where she finally confessed. *Cf. United States v. Beck, supra*, 598 F.2d at 500 ("... a significant consideration [in determining whether an arrest occurred] is the extent that freedom of movement is curtailed"). Further, before this confession, defendant was presented with the statement of her companion and was accused in a raised tone of voice of lying.

---

**6.** In the instant case, defendant was also given her *Miranda* warnings in Gooding. This factor should be considered as weighing in favor of finding an arrest. Though the warnings inform the suspect that she need not talk to the police and can have legal counsel, most people undoubtedly associate *Miranda* warnings with arrest. *Miranda* warnings need be given only when a suspect is in police custody or his freedom of action is restrained in any significant way. *See, e.g., California v. Beheler, supra; Ore-*gon v. Mathiason*, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *Beckwith v. United States*, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Miranda v. Arizona, supra.*

**7.** Nothing in the record indicates that the normal safety procedures of the Gooding County Sheriff require visitors to be accompanied to the restroom.

Despite being told twice that there was no arrest, a reasonable person could not truly believe these statements when they were followed by police actions clearly contradicting the statements. "The mere facts that petitioner was not told he was under arrest, was not 'booked', and would not have had an arrest record if the interrogation had proved fruitless ... obviously do not make petitioner's seizure even roughly analogous to the narrowly defined intrusions involved in *Terry* and its progeny." *Id.*, 442 U.S. at 212–213, 99 S.Ct. at 2256–2257 (citation omitted). The totality of the circumstances suggests a coercive, police-mediated atmosphere, indicative of arrest. *See State v. Waicelunas, supra.* To hold otherwise would exalt form over substance. *Dunaway v. New York, supra.*

Thus, the trial court erred in determining that no arrest occurred in the instant case. As this arrest was without probable cause, it was illegal. *State v. Hein*, 138 Ariz. 360, 674 P.2d 1358 (1983).

## IV

■ The general rule is that a confession obtained as the result of an illegal arrest must be suppressed. *Brown v. Illinois, supra.* However, the determination that an illegal arrest has transpired is not dispositive of the issue of the admissibility of a subsequent confession. The relevant inquiry is whether the defendant's statements "were obtained by exploitation of the illegality of his arrest." *Id.*, 422 U.S. at 600, 95 S.Ct. at 2260; *State v. Reffitt, supra.* Although the Supreme Court has not established a "bright line" test for the admissibility of confessions obtained after an illegal arrest, it has identified certain factors as particularly important: "[t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Brown v. Illinois, supra*, 422 U.S. at 603–604, 95 S.Ct. at 2261–2262. Measured against these factors, we believe that the defendant's confession should have been suppressed.

Cases of this nature inherently turn upon the particular circumstances adduced at trial. Thus no mechanical test can be devised which cleanly separates acceptable confessions from those fatally tainted by the illegal arrest. Nonetheless, our review of the facts convinces us that the defendant's confession is inadmissible. The inculpatory statements were given approximately three and a half to four hours after the illegal arrest commenced. The proximity of the confession to the arrest raises a strong inference that the statements "were obtained by exploitation of the illegality." *Compare Brown v. Illinois, supra* (confession suppressed when obtained within two hours of illegal arrest); *Dunaway v. New York, supra* (confession suppressed when obtained within two hours of illegal arrest) *with Taylor v. Alabama, supra* (confession suppressed though obtained six hours after illegal arrest).

The state's argument that intervening circumstances were present which vitiate the illegality of the arrest fares no better. According to the state, defendant's statement was not obtained until after Tittle gave his statement implicating defendant. Thus, the state argues,

"if in fact [defendant] was illegally arrested prior to Tittle's statement, the statement provided the necessary probable cause to validate appellant's arrest. Accordingly, Tittle's statement served as the intervening event necessary to break the connection between appellant's alleged illegal detention and her confession."

State's brief at 10.

■ We reject this argument. Such reasoning ignores the fact that the confrontation with Tittle's statement was itself the result of defendant's illegal arrest. In *Dunaway v. New York, supra*, the Supreme Court considered facts analogous to those at bar and rejected the contention that intervening circumstances existed. In *Dunaway* the police obtained fingerprints from the defendant after his illegal detention, and based on the fingerprints were able to extract a confession from the de-

fendant. The Court held that since the fingerprints "were themselves the fruit of petitioner's illegal arrest" the confession had to be suppressed. 457 U.S. at 693, 102 S.Ct. at 2668. Intervening circumstances must be independent, not the product of police misconduct. The position the state urges is dangerous because it would grant law enforcement authorities

"an unfettered discretion to illegally seize any person or any number of persons on mere suspicion secure in the knowledge that if by chance a subsequent confession is obtained by means of a confrontation with a suspected co-defendant, the illegally seized individual will not have the right to suppress the tainted confession."

*Commonwealth v. Wright*, 460 Pa. 247, 332 A.2d 809, 812 (1975) (Manderino, J., dissenting).

Finally, we find that the illegal arrest had a "quality of purposefulness" designed as an "expedition for evidence" in the hope that defendant might confess. *See Dunaway v. New York, supra*, 442 U.S. at 218, 99 S.Ct. at 2259. No other conclusion is reasonable when the facts of the case are reviewed objectively. The purpose and flagrancy of official misconduct is entitled to special weight. *State v. Reffitt, supra*, 145 Ariz. at 460, 702 P.2d at 689. To condone such fishing expeditions would compromise the important protections of the Fourth Amendment and "subject unlimited numbers of innocent persons to the harassment and ignominy incident to involuntary detention. Nothing is more clear than that the Fourth Amendment was meant to prevent wholesale intrusion upon the personal security of our citizenry." *Davis v. Mississippi*, 394 U.S. 721, 726–727, 89 S.Ct. 1394, 1397, 22 L.Ed.2d 676 (1969). The trial court, therefore, erred in admitting defendant's confession into evidence.

■ An error is harmless only if no reasonable probability exists that the verdict might have been different had the error not been committed. *State v. Williams*, 133 Ariz. 220, 225, 650 P.2d 1202, 1207 (1982). Reviewing the record, it is obvious that at the very least a reasonable probability exists that the verdict might have been different had the confession not been admitted. Thus, the error was not harmless and the conviction must be reversed. This case is remanded to the trial court for proceedings not inconsistent with this opinion. Because of our disposition of this case, we need not address the remaining issues raised in defendant's brief.

HOLOHAN, C.J., and HAYS and FELDMAN, JJ., concur.

CAMERON, Justice, specially concurring.

I concur in the result.