IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

THE STATE OF ARIZONA,
*Appellee,*

*v.*

MATTHEW THOMAS SNYDER,
*Appellant.*

No. 2 CA-CR 2015-0077
Filed October 7, 2016

Appeal from the Superior Court in Pima County
No. CR20131331001
The Honorable Richard D. Nichols, Judge

**REVERSED; VACATED AND REMANDED**

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Amy M. Thorson, Assistant Attorney General, Tucson
*Counsel for Appellee*

Steven R. Sonenberg, Pima County Public Defender
By Erin K. Sutherland, Assistant Public Defender, Tucson
*Counsel for Appellant*

**OPINION**

Judge Staring authored the opinion of the Court, in which Chief Judge Eckerstrom and Judge Espinosa concurred.

S T A R I N G, Judge:

**¶1**        Matthew Snyder was convicted after a jury trial of two counts of possession of a deadly weapon by a prohibited possessor, one count of possession of a dangerous drug, and one count of possession of drug paraphernalia. The trial court sentenced him to concurrent prison terms, the longest of which was 2.5 years. On appeal, Snyder challenges the court's denial of his motion to suppress evidence obtained during the search of his backpack, the sufficiency of evidence related to the possession of an antique pistol, and the jury instructions and testimony related to the operability of the antique pistol. On the record before us, we conclude the search of Snyder's backpack was unconstitutional and reverse the court's ruling and vacate Snyder's convictions and sentences.[1]

## Factual and Procedural Background

**¶2**        When reviewing the denial of a motion to suppress, we consider only the evidence presented at the suppression hearing, viewing those facts in the light most favorable to upholding the trial court's ruling. *See State v. Wyman*, 197 Ariz. 10, ¶ 2, 3 P.3d 392, 394 (App. 2000). In January 2013, S.D., a loss-prevention officer at a Tucson grocery store, observed Snyder select two steaks at the butcher's counter, place them in a shopping bag from another store, and walk towards the exit. Snyder was carrying a backpack, but S.D. did not see him place anything in it. S.D. confronted Snyder and, with the help of another person, detained him. During the confrontation, Snyder suffered a broken knee cap.

---

        [1]Because we reverse as a result of the unconstitutional search, we decline to address Snyder's remaining arguments, including those concerning the operability of the antique pistol.

**¶3** Tucson Police Department (TPD) Officer Ives arrived approximately ten minutes later in response to a shoplifting dispatch, and store employees told him Snyder was being held in the security office. According to Ives, the security office was "oddly shaped," consisting of two separate rooms: a smaller one in which Snyder was detained and a larger one for employees only. Ives testified there was "either no door" to the smaller room "or the door was open."

**¶4** At the security office, Ives spoke with S.D., who told Ives his version of what had taken place. Ives then advised Snyder of his *Miranda*[2] rights before questioning him. Snyder told Ives he was about to purchase the steaks when he realized he did not have a certain "card" he had intended to use to pay for them, and that he started to walk out of the store to get the card from his car. Throughout Ives's questioning, Snyder remained bound in handcuffs S.D. had placed on him when he was detained.

**¶5** After speaking to S.D. and Snyder, Ives decided to arrest Snyder for shoplifting. Snyder, however, was never arrested or issued a citation for that offense. Before Ives replaced S.D.'s handcuffs with his own, he instructed TPD Officer Dave, who had just arrived, to search Snyder's backpack. The backpack was in the other room, an area of the security office designated for employees, next to the doorway leading into the room where Snyder was detained. Inside the backpack, Dave found an antique flintlock pistol, a .22-caliber handgun, a small bag containing "white crystalline powder that [he] believe[d] to be methamphetamine," and several rounds of ammunition.

**¶6** Because Snyder had injured his knee during the confrontation with S.D., paramedics were called, and he was transported by ambulance to a hospital. Dave took Snyder's backpack to the police station. After Snyder was released from the hospital, he was indicted for the offenses noted above.

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

¶7        Snyder moved to suppress the evidence obtained from the search of his backpack.  At the suppression hearing, Snyder argued he was never placed under arrest by Ives and thus his backpack could not have been searched incident to arrest.  He also argued no exigent circumstances existed to justify searching the backpack without a warrant because it was not in an area where he could reach it and he was in handcuffs throughout the encounter.  The trial court found Snyder had been arrested as of the time the backpack was searched, but did not rule on whether the search was a valid search incident to arrest.  Rather, the court found the search "would [have been] inevitable due to the defendant's property being searched upon arrest and transport[]" and denied the motion to suppress.  This appeal followed his convictions and sentences.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1) and 13-4033(A).

## Motion to Suppress

¶8        Snyder challenges the suppression ruling on three bases:  he was never placed under arrest, therefore a search of his backpack could not be justified as a search incident to arrest; even if he had been placed under arrest, his backpack was not within an area under his immediate control; and, any search of his backpack was not inevitable.  We review a trial court's ruling on a motion to suppress for an abuse of discretion, but we review constitutional and purely legal issues de novo.  *State v. Moody*, 208 Ariz. 424, ¶ 62, 94 P.3d 1119, 1140 (2004).

### Arrest

¶9        Whether an arrest has occurred is a mixed question of fact and law.  *See State v. Blackmore*, 186 Ariz. 630, 632, 925 P.2d 1347, 1349 (1996).  While we defer to the trial court's factual determinations, we review its legal conclusion de novo.  *See id.*

¶10        "An arrest is complete when the suspect's liberty of movement is interrupted and restricted by the police."  *State v. Winegar*, 147 Ariz. 440, 447-48, 711 P.2d 579, 586-87 (1985).  Whether an arrest has occurred is based on an objective view of the evidence, not the subjective beliefs of the parties.  *Id.* at 448, 711 P.2d at 587

("Indeed, '[a] certain set of facts may constitute an arrest whether or not the officer intended to make an arrest and despite his disclaimer that an arrest occurred.'"), *quoting Taylor v. Arizona*, 471 F.2d 848, 851 (9th Cir. 1972) (alteration in *Winegar*). "The issue turns upon an evaluation of all the surrounding circumstances to determine whether a reasonable person, innocent of any crime, would reasonably believe that he was being arrested." *Id.*

¶11 A significant factor in determining whether an arrest has occurred "is the extent that freedom of movement is curtailed and the degree and manner of force used." *State v. Ault*, 150 Ariz. 459, 464, 724 P.2d 545, 550 (1986). "Another significant factor is the display of official authority, such that 'a reasonable person would . . . not [feel] free to leave.'" *Id.*, *quoting Winegar*, 147 Ariz. at 448, 711 P.2d at 587. "[H]andcuffing a suspect is an indicia of arrest." *State v. Rowland*, 172 Ariz. 182, 184, 836 P.2d 395, 397 (App. 1992). Giving a defendant *Miranda* warnings is also "considered a factor weighing in favor of concluding that there was an arrest because most people associate the warnings with arrest." *Id.*

¶12 Snyder argues he was not placed under arrest because the police did not restrict his freedom of movement; rather, "the only restriction of freedom of movement came from the loss prevention officer who handcuffed [him] and placed him in the manager's office to wait for the police to arrive." Snyder further argues there was no indication from either police officer that he was being placed under arrest and there was no show of authority by either officer to which he could submit.

¶13 We disagree. Snyder was detained by S.D., placed in handcuffs, and kept in a separate room located in a security office to await the police. When Ives arrived, he gave Snyder *Miranda* warnings and questioned him about the incident. Then, after speaking to S.D. and Snyder, Ives replaced S.D.'s handcuffs on Snyder with his own. Viewing the facts objectively, a reasonable person would reasonably believe he was being arrested by at least that point and would not believe he was free to leave. *See Ault*, 150 Ariz. at 464, 724 P.2d at 550 ("No reasonable person would have

believed that he was free to leave the scene at this point.").  The trial court correctly concluded Snyder had been placed under arrest. [3]

**Search Incident to Arrest**

**¶14**         Snyder argues the search of his backpack "cannot be justified as a search incident to arrest because the reasons justifying a search incident to arrest were not present" and the "backpack was not in [an] area under his immediate control."  Based on the record before us, we agree.

**¶15**         In reviewing a motion to suppress for an alleged Fourth Amendment violation, "we defer to the trial court's factual findings, but we review de novo mixed questions of law and fact and the trial court's ultimate legal conclusion."  *See Wyman*, 197 Ariz. 10, ¶ 5, 3 P.3d at 395.  Notably, the state bears the burden of proving the lawfulness of a search by a preponderance of the evidence.  Ariz. R. Crim. P. 16.2(b).  And, "a search must be justified at its inception, not by what it turns up."  *State v. Taylor*, 167 Ariz. 439, 440, 808 P.2d 324, 325 (App. 1990).

**¶16**         The Fourth Amendment prohibits unreasonable searches.  U.S. Const. amend. IV.[4]  Warrantless "searches conducted

---

[3]At oral argument, Snyder claimed a distinction exists between a "de facto" arrest when a reasonable person would believe he was being arrested, and a "custodial arrest" when a person is actually taken into custody.  Because, as discussed below, we conclude Snyder's backpack was not in his immediate control at the time of his arrest, we need not address whether any such distinction would affect the rationale for conducting a search incident to arrest.

[4]Snyder also argues the search violated article II, § 8 of the Arizona Constitution, but "except in cases involving 'unlawful' warrantless home entries, Arizona courts have not yet applied [article II, § 8] to grant broader protections against search and seizure than those available under the federal constitution."  *State v. Juarez*, 203 Ariz. 441, ¶ 14, 55 P.3d 784, 787 (App. 2002).  Moreover, article II, § 8 "has historically been construed as imposing limits on search and seizure consistent with the prohibitions of the Fourth

outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). One exception to the warrant requirement "is a search incident to a lawful arrest." *Arizona v. Gant*, 556 U.S. 332, 338 (2009). "The exception derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations." *Id.*

¶17        An officer is permitted to search a person incident to a lawful arrest, but the search is circumscribed to "the arrestee's person and area 'within his immediate control,'" that is, "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Chimel v. California*, 395 U.S. 752, 763 (1969), *abrogated on other grounds by Gant*, 556 U.S. at 343. The search is further limited to those "areas in the arrestee's 'immediate control' *at the time of arrest.*" *United States v. Camou*, 773 F.3d 932, 937 (9th Cir. 2014) (emphasis added), *quoting Gant*, 556 U.S. at 339; *see also United States v. Chadwick*, 433 U.S. 1, 15 (1977), *quoting Preston v. United States*, 376 U.S. 364, 367 (1964) ("[W]arrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' . . . or no exigency exists."), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565, 580 (1991). The limited search allowed by the exception "ensures that the scope of a search incident to arrest is commensurate with its purposes of protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." *Gant*, 556 U.S. at 339.

¶18         "If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search," the justifications for the search, officer safety and evidence preservation, "are absent and the rule does not apply." *Id.* And an officer may not "routinely search[] any room other than that in which an arrest occurs—or, for that matter, [search] through all the desk drawers or

_____

Amendment." *Id.* ¶ 15. We therefore apply Fourth Amendment jurisprudence here.

other closed or concealed areas in that room itself." *Chimel*, 395 U.S. at 763. Thus, in determining the validity of a search incident to a lawful arrest, we conduct a two-fold inquiry: (1) was the searched item within the arrestee's immediate control when he was arrested; and (2) was the search contemporaneous to the arrest. *See State v. Dean*, 206 Ariz. 158, ¶ 29, 76 P.3d 429, 436 (2003). The state must demonstrate both in order for the exception to apply.

¶19        The state argues Snyder's backpack was within his immediate control because it was next to the entrance of the room in the security office where Snyder was detained. According to the state, Snyder could have "quickly reached the backpack (notwithstanding the handcuffs) in order to obtain a weapon or destroy evidence." We disagree.

¶20        The evidence presented at the suppression hearing established that when Ives arrived, Snyder was already in handcuffs and had been separated from his backpack, which was in another room. Snyder remained in handcuffs and separated from his backpack as Ives questioned him and S.D. for the next ten to twenty minutes. When Ives then decided to arrest him, Snyder was still in handcuffs and still separated from his backpack. Thus, the undisputed evidence established Snyder's backpack was not within his immediate control at the time of his arrest. And, given the fact he was handcuffed at all relevant times, including before his arrest, under the close supervision of one or more law enforcement officers during and immediately after his arrest, and suffering from a broken knee cap as a result of the confrontation with S.D., we see no possibility Snyder could have reached into the backpack at the time of his arrest. *See Gant*, 556 U.S. at 339 ("If there is no possibility that an arrestee could reach into the area that law enforcement officers seek to search," then "the [search-incident-to-arrest] rule does not apply.").

¶21        The state relies upon *State v. Noles*, 113 Ariz. 78, 546 P.2d 814 (1976), to support its argument that the search of Snyder's backpack was a valid search incident to arrest. But in *Noles*, the defendant was not already in handcuffs when he was placed under arrest. *Id.* at 80, 546 P.2d at 816. Rather, after being informed by an accomplice that he was armed with two firearms,

and aware that he was the subject of an arrest warrant, law enforcement officers entered the defendant's motel room with guns drawn and found him lying on a bed. *Id.* He was immediately handcuffed and the officers proceeded to search the nightstand next to the bed. *Id.* Our supreme court found the search valid as one incident to arrest because the search was confined to "an area within the immediate control of the defendant at the time of arrest." *Id.* at 82, 546 P.2d at 818.

**¶22** Here, the state has failed to shoulder its burden of demonstrating the lawfulness of the search. As noted above, Snyder had been detained in handcuffs and separated from his backpack for approximately twenty minutes prior to his arrest. The backpack was in another room, and Snyder was suffering from a significant knee injury. Thus, unlike *Noles*, in which the search was confined to an area within the defendant's immediate control, the nightstand next to the bed where he was arrested, Snyder's backpack was not in an area within his immediate control at the time of arrest. The search therefore did not amount to a valid search incident to arrest.

**Inevitable Discovery**

**¶23** Although we conclude the evidence found in Snyder's backpack was obtained as the result of an unlawful search, "[i]llegally obtained physical evidence may be admitted if the State can demonstrate by a preponderance of the evidence that such evidence inevitably would have been discovered by lawful means." *State v. Davolt*, 207 Ariz. 191, ¶ 35, 84 P.3d 456, 469 (2004); *see also Nix v. Williams*, 467 U.S. 431, 444 (1984). Snyder argues the search of his backpack could not be justified under the inevitable discovery doctrine because the search was not inevitable, and any concern for officer safety or evidence preservation was absent.

**¶24** We note at the outset that although the trial court's ruling on this matter was based on the doctrine of inevitable discovery, the state neglected to address this issue in its answering brief. And, at oral argument, the state represented that it is not relying on the doctrine in support of its argument that the evidence from the backpack was properly admitted. Snyder urges us to find

the state has conceded that the inevitable discovery doctrine does not apply and, therefore, does not justify the court's ruling.

**¶25** "Failure to argue a claim usually constitutes abandonment and waiver of that claim." *State v. Carver*, 160 Ariz. 167, 175, 771 P.2d 1382, 1390 (1989). At the same time, however, we are obliged to uphold a trial court's ruling if legally correct. *See State v. Boteo-Flores*, 230 Ariz. 551, ¶ 7, 288 P.3d 111, 113 (App. 2012). We need not resolve this dichotomy here, however. "[W]aiver is a procedural concept that courts do not rigidly employ in mechanical fashion," *State v. Aleman*, 210 Ariz. 232, ¶ 24, 109 P.3d 571, 579 (App. 2005), and we may employ our discretion when determining whether "to address a significant, albeit waived, issue," *see State v. Kinney*, 225 Ariz. 550, n.2, 241 P.3d 914, 918 n.2 (App. 2010). Given the constitutional nature of the inevitable discovery exception and the court's reliance on it, we choose to address the issue.

**¶26** As noted above, the trial court found Snyder's backpack inevitably would have been searched once he was arrested and transported to jail as part of an inventory search. The inventory search is a "well-defined exception to the warrant requirement." *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983). Specifically, "[a]t the stationhouse, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed." *Id.* at 646. But, "[t]he policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into 'a purposeful and general means of discovering evidence of crime.'" *Florida v. Wells*, 495 U.S. 1, 4 (1990), *quoting Colorado v. Bertine*, 479 U.S. 367, 376 (1987) (Blackmun, J., concurring).

**¶27** In *State v. Calabrese*, we concluded the inevitable discovery doctrine did not apply to an "accelerated" booking search of a defendant arrested for a misdemeanor. 157 Ariz. 189, 191, 755 P.2d 1177, 1179 (App. 1988).[5] There, officers arrived at a hospital

---

[5]In *State v. Paxton*, this court found the discussion of this issue in *Calabrese* to be dicta because "[t]here was no need . . . to consider whether the inevitable discovery exception applied." 186 Ariz. 580,

to find the defendant forcibly detained by security guards for refusal to leave the grounds. 157 Ariz. at 190, 755 P.2d at 1178. The officers handcuffed the defendant "because of his agitated state and his conduct." *Id.* After speaking to hospital security personnel, they decided to arrest the defendant for criminal trespass and searched his pockets, finding a syringe and cocaine. *Id.* We held the inevitable discovery rule was inapplicable. *Id.* at 191, 755 P.2d at 1179. We first noted that because the offense for which the defendant had been arrested was a misdemeanor, it was not inevitable that he would have been subject to an inventory search. *Id.*; *see* A.R.S. § 13-3903(A) (arresting officer may release person arrested for misdemeanor offense prior to taking them to a law enforcement facility). We went on to state:

> The legitimate purposes of a booking inventory search do not justify a premature search performed before the booking process has even begun. If we were to allow all warrantless searches to be justified by the argument that any evidence would ultimately have been discovered on booking at the jail, police officers would have a license to immediately and thoroughly search the person and effects of any individual arrested without a warrant for any minor but bookable offense in the hope of discovering evidence of a more serious crime. That would result in the arrestee being booked on the greater charge and the search being justified as an accelerated booking search. We do not believe that constitutes a permissible exception to the requirement for a warrant.

---

585, 925 P.2d 721, 726 (App. 1996). To the extent the reasoning in *Calabrese* amounts to dicta, we nonetheless find it highly persuasive in connection with the record before us.

157 Ariz. at 191, 755 P.2d at 1179.

¶28        Given the record before us, and following the reasoning of *Calabrese*, we disagree that the search of Snyder's backpack was inevitable. Ives intended to arrest Snyder for shoplifting, mostly likely a misdemeanor under the circumstances of this case. *See* A.R.S. § 13-1805(H). Thus, it was left to Ives's discretion whether to take him to jail or release him. *See* § 13-3903(A).[6] Ives testified that whether a person is booked and transported to jail "depends on the person, their demeanor, willingness to work with loss prevention, do they have warrants, their history, do we have a history with this person of continual shopliftings. So it's left up to our discretion." Furthermore, although Ives testified he had decided he would be taking Snyder to jail, Snyder was not taken to jail. Instead, he was taken to the hospital by ambulance. Only later would he be indicted, prior to any arrest, for those charges stemming from the search of his backpack.

¶29        The concerns expressed in *Calabrese* are borne out by the record in this case. Snyder was never charged with, cited or arrested for, shoplifting; instead, he was charged with offenses related solely to the items found in his backpack. And, according to Ives, it is TPD policy not to bring misdemeanor charges once felony charges have been obtained. This is done to prevent defendants from pleading to a misdemeanor charge and having the felony charges dropped as a result. The reasoning in *Calabrese* is particularly compelling in light of these policies and practices.

¶30        The state also argued in the trial court that the search of Snyder's backpack was inevitable because TPD general orders

---

[6]Under § 13-3903(A), "[i]n any case in which a person is arrested for a misdemeanor offense or a petty offense, the arresting officer may release the arrested person from custody in lieu of taking the person to a law enforcement facility." Although Ives stated he had decided to take Snyder to jail, under the statute he could have changed his mind at any point before reaching the jail and released him instead. Thus it was not inevitable Snyder would have been subject to an inventory search.

require officers transporting suspects to search them before placing them in a police vehicle.[7] According to Ives, it is standard policy that all personal property belonging to an arrestee who is being transported to the Pima County Jail "will be searched prior to it being placed in [the police] vehicle." The reason for conducting such a search is "for [officer] safety and for jail staff safety, and [to] prevent contraband and other items from getting into the jail."[8] But, as noted above, Snyder was not taken to jail and was not transported in a police vehicle. The state therefore failed to demonstrate that it was inevitable that his backpack would have been searched incident to jail booking, which never occurred in the near aftermath of his arrest, or his transport, which occurred only by ambulance to the hospital.

¶31 Further, although officer safety is a critically important concern, it does not universally justify the warrantless search of any and all items possessed by an arrestee. Ordinarily, when the arrestee's property has already been seized, the justifications of immediate officer safety and evidence preservation no longer apply.

---

[7] The state further argued the search of the backpack was inevitable because "in accompanying [Snyder] to [the hospital], officers would have had to transport the bag separately from [Snyder], and check it for weapons before putting [it in] their vehicle." According to Ives, however, when a suspect is transported to the hospital "in general their property will either go with them or will get put into our prisoner property section." It was therefore not inevitable that Snyder's backpack was going to be searched. Moreover, the state did not introduce any evidence that TPD officers routinely, or by formal protocol, search the belongings of misdemeanants when they are to be transported to the hospital by ambulance.

[8] According to TPD general orders quoted in the state's answer below, "Transporting Officers shall search prisoners prior to placing them in the vehicle. Hand-carried prisoner property, such as purses, briefcases, knapsacks, etc., shall likewise be searched for weapons if it is to be transported in a police vehicle. These items shall not be transported in the prisoner compartment of the police vehicle."

*See Chadwick*, 433 U.S. at 15 (finding that upon law enforcement officers' removal of luggage or other personal property from person's exclusive control, danger no longer exists that person "might gain access to the property to seize a weapon or destroy evidence," and search of property not incident to arrest); *see also Lafayette*, 462 U.S. at 649 (Marshall, J., concurring) ("[A]lthough a concern about weapons might have justified seizure of the bag, such a concern could not have justified the further step of searching the bag following its seizure."). "Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers *have reason to believe* that luggage contains some immediately dangerous instrumentality." *Chadwick*, 433 U.S. at 15 n.9 (emphasis added). But Ives gave no such reason, nor does the record contain any expression of any reason to believe Snyder's backpack contained an immediately dangerous instrumentality prior to the search.

## Disposition

**¶32**       For the foregoing reasons, we hold the trial court erred in denying Snyder's motion to suppress the evidence resulting from the search of his backpack. Accordingly, we reverse the court's ruling, vacate the convictions and sentences, and remand for further proceedings consistent with this opinion.